Gary N. FIELDS, Plaintiff–Appellant,

v.

Edward W. MURRAY, Director, Virginia
Department of Corrections,
Defendant–Appellee.

No. 91–7169.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1994.

Decided March 20, 1995.

**ARGUED:** Steven H. Goldblatt, Director, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, DC, for appellant. Katherine P. Baldwin, Asst. Atty. Gen., Office of the Atty. Gen., Richmond, VA, for appellee. **ON BRIEF:** Bonnie Robin–Vergeer, Supervising Atty., David B. Goodhand, Supervising Atty., Bradley T. Kornfeld, Student Counsel, Andrew S. Miller, Student Counsel, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, DC, for appellant. James S. Gilmore, III, Atty. Gen. of Virginia, Office of the Atty. Gen., Richmond, VA, for appellee.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, WILLIAMS, and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge RUSSELL wrote the majority opinion, in which Judges WIDENER, WILKINSON, WILKINS, NIEMEYER, HAMILTON and WILLIAMS joined. Chief Judge ERVIN wrote a dissent, in which Judges HALL, MURNAGHAN and MICHAEL, and Senior Judge PHILLIPS joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

Plaintiff Gary Fields appeals the district court's denial of his habeas petition, contending that the state court that conducted his trial on sexual abuse charges unconstitutionally denied him his right to self-representation. A panel of this Court reversed the district court's denial and ordered that the writ issue. Subsequently rehearing *en banc* was granted. We now affirm the district court's denial of Fields' petition.

### I.

During the time period relevant to this case, Fields, who is divorced, lived in a trailer home with his mother and his daughter, Deanna, who was twelve at the time. Fields and his mother occupied the two bedrooms in the home; Deanna slept in the living room. Deanna was quite popular with her peers, and her group of young girl friends spent a great deal of time at Fields' home, becoming so closely acquainted with Fields that they called him "dad." Many times during the period at issue in this case they slept over at Fields' home with Deanna.

According to the girls, a regular routine was followed during these sleep-overs. When the girls were preparing to go to sleep, Fields gave each of them a handful of pills, telling them that the pills were vitamins. Some of the pills were vitamins but others, unidentified to the girls at the time, were sleeping pills.[1] The girls would become drowsy and, as they were falling asleep, Fields gave them backrubs. During the backrubs, he frequently fondled their private areas. In the middle of the night, he would often return to the living room where the

1. Deanna testified at the trial that she had found the bottle from which these unidentified pills were taken and the label on the bottle indicated that they were sleeping pills.

girls were sleeping and fondle them again. On many of these occasions, he would take one of the girls from the living room to his bedroom and rape her.

This sickening routine continued for a number of months. Three of Deanna's friends testified that Fields had raped them during these sleep-overs, with one indicating that she had been raped by Fields many times over a three-month period and another that it had happened on nine or ten occasions. Three other friends of Deanna stated that Fields had fondled them at these sleep-overs, and one of them indicated that Fields had done this ten or more times.

Deanna testified that she as well had been sexually abused by Fields, her father. Once, purporting to explain to her about the birds and the bees, he had taken off her clothes and raped her. In a separate instance, he had fondled all of her private areas. She had difficulty recalling the details of a third occasion because she apparently had taken sleeping pills given to her by Fields.

Fields' routine at these sleep-overs was allowed to continue for months because, as the girls testified, they were afraid to tell anyone about it. Fields' actions only came to light when he babysat for a night for three young children of a friend, Mrs. Shackleford, whose husband was dying in the hospital. Johnny Shackleford, aged ten, refused Fields' offer of sleeping pills and was awake to witness Fields, after spitting on his hands, fondle his ten-year-old sister Julie and his twelve-year-old sister Rose. Johnny afterwards told an adult what had occurred and, when Johnny's story was corroborated by the independent statements of his two sisters and at least four other girls who had attended these sleep-overs, Fields' revolting routine was terminated.

In May, 1988, a grand jury in Newport News, Virginia, charged Fields with six counts of aggravated sexual battery, one count of forcible sodomy, and one count of rape. The Circuit Court for the City of

Newport News appointed attorneys Oldric J. Labell, Jr.,[2] and James A. Segall to represent Fields.

Prior to the trial, in June, 1988, Fields wrote to the presiding judge in his case, the Honorable Douglas M. Smith, requesting "to be appointed as co-council [sic]." He admitted: "I do this with reluctance since my knowledge of the law is limited," and, as he acknowledged later in the letter, "I have a learning disability and related attention span defecit [sic]." Nonetheless, he wished to act as co-counsel in order to "question the witnesses [him]self" because he "firmly [believed] these kids cannot look me in the eye and lie to me. They have been treated as if they were my own kids [and] call me dad. I know them well." He added:

> I do not intend to try and intimidate the witnesses just to get them to say what they think I want them to say. In fact I will if you wish not approach them closer than three feet and I would request the courts [sic] permission if for some reason I needed to get closer.[3]

The panel opinion in this appeal added that, in Fields' first letter to the state judge he "felt the complaining witnesses had lied at the preliminary hearing, and that his appointed counsel had not proven themselves capable of effectively cross-examining the witnesses. Fields explained that he needed to cross-examine the juvenile witnesses because only he had sufficient knowledge of the complex events that led to his prosecution to guarantee an effective examination." There can be no question that in this statement Fields demonstrated that the motivation for his motion for the right to cross-examine the children was simply to secure the right to conduct such cross-examination.

On August 16, 1988, Fields wrote a second letter to Judge Smith, this time asking "for a new attorney to replace Mr. Labell [and] Mr. Segall." Fields explained that, for a variety of reasons, he had concluded, according to

---

2. Mr. Labell's first name is also spelled "Oldrick" at points in the record.

3. Fields also noted in this letter that one of these girls who was a witness against him had "burst into tears" at a preliminary hearing "because she

was embarrassed," and that this same girl "had wet the bed repeatedly." This incident would seem to demonstrate how traumatized these girls were over this alleged abuse by Fields.

the panel opinion, that his "council [sic] [could not] handle [his] defense." We read his request to act as co-counsel as the only reason for his demand of the right to cross-examine the children. This seems clear from the summarization of this letter by the panel opinion, which said:

> Fields complained that he disagreed with attorney LaBell over how to conduct his defense: "Our approaches to my defense ha[ve] been on divergent courses." Fields accused LaBell of wanting "to conduct a defense by burying his head in law books" and of "using legalistic manipulations." Fields explained that he wished to employ a different trial strategy: "My approach has always been to simply get the remainder of the stories from the witness[es] by questioning them myself on the stand."

Approximately two weeks later, on August 29, 1988, after the state court had apparently not approved Fields' request, according to the record, for new counsel,[4] Fields again wrote to Judge Smith, explaining his reason for applying for the right personally to cross-examine the children:

> I heard perjury committed [sic] at the hearing and I believe the witnesses would not hesitate to lie again to a stranger. The stranger I am referring to would be any council [sic] asking them questions.

The state trial court held a hearing on September 7, 1988, in part to address Fields' letters. At that hearing, the following colloquy ensued:

> THE COURT: What seems to be your problem?
>
> FIELDS: There are several problems, Your Honor. One has been no contact

with my attorneys in the past. No verbal contact and—

> THE COURT: Well, you indicated to me by letter that you didn't ever want to see him again.
>
> FIELDS: That's true.
>
> THE COURT: So now you're complaining that you haven't seen him?
>
> FIELDS: I had no use for him. If they weren't coming over, what the heck were they doing? And when he did come over, I wasn't asked my opinion on what had happened in the case or how I should be approached for the defense. They had already gone off their paths, and my opinions or my thoughts just weren't relevant in that.
>
> THE COURT: You haven't got a legal degree, have you?
>
> FIELDS: No, sir.
>
> THE COURT: Don't you think these two attorneys are better suited for what ought to be brought up in your case and what ought not to be brought up?
>
> FIELDS: In some respects.

The Court then explained that he would not allow Fields to cross-examine the young girls who were witnesses against him; instead, he could "write out [his] questions and give it to [his] lawyers if [he] want[ed] to."[5] When, at the hearing, the trial judge made it plain that he would not permit Fields to cross-examine the children, Fields responded, as the panel opinion points out, "Well, then, there won't be any justice in this courtroom." This ended the conversation between Fields and the trial judge. Fields' demand had not changed or "evolved." He was still focusing wholly on his demand to cross-examine the children, so much so that he de-

---

4. The trial court's response to Fields' request for new counsel is not in the record.

5. The trial judge, as this quotation shows, afforded Fields the right to submit his questions through his lawyer. This is very similar to the suggestion in the panel opinion that, assuming a finding, direct or implicit, of necessity, "the trial court could properly employ special procedures that preserve the core right of the defendant to conduct his own defense while adequately protecting the welfare of the child witness." "Among the procedures that we [referring to the panel] believe proper, assuming they are permit-

ted under local law, would be: installing a screen or other barrier between the defendant and the witnesses; conducting closed sessions out of the courtroom; placing the defendant and the witnesses in separate rooms; requiring the defendant to submit his questions to the judge who, after scanning them, would read them aloud to the witness; . . . ." It added that use of such a procedure as that suggested would "leave[s] the proper latitude with the trial judge in *conforming to the constitutional dictate while addressing the serious policy implications of this case.*" (Italics added).

clared there would "not be any justice in this courtroom" if the trial judge denied him the right to cross-examine the children. That is the unquestioned demand of Fields. If that right was given him, he said, in effect, that he would be content.

Fields was convicted on five counts of aggravated sexual battery.[6] He appealed his conviction to the Court of Appeals of Virginia, arguing, *inter alia,* that the trial court had refused to allow him to proceed *pro se* and cross-examine personally the young girls who were witnesses against him; this refusal, he contended, violated his right to self-representation.

The State Court of Appeals rejected this contention. *Fields v. Commonwealth,* No. 1697–88–1, slip op. at 3 (Va. Ct.App. Aug. 21, 1990). The Court noted that to trigger his self-representation right, "the defendant must knowingly waive his right to counsel by clear and unequivocal assertion of the right to self-representation." *Id.* at 2–3. It found that "[t]he record ... contains no clear and unequivocal waiver of counsel. To the contrary, the record shows that [Fields] wanted, and repeatedly requested, permission only to conduct cross-examination." *Id.* at 3. The Supreme Court of Virginia refused Fields' petition for review of the court of appeals' decision. *Fields v. Commonwealth,* No. 901282 (Va. Nov. 26, 1990); *see Saunders v. Reynolds,* 214 Va. 697, 204 S.E.2d 421, 424 (1974) (holding that Virginia Supreme Court's refusal of petition for review operates as a ruling on the merits).

In February, 1991, Fields filed in the Eastern District of Virginia the habeas petition at issue here, making the same contention he advanced before the Court of Appeals of Virginia and the Supreme Court of Virginia. The petition was referred to Magistrate Judge Thomas Miller, who recommended that it be denied. *Fields v. Murray,* No. 91–100–N, slip op. at 8 (E.D. Va. June 10, 1991). He stated: "[E]ven without the [section

2254(d) ] presumption, this Court concurs solidly with the state courts' findings that Fields' letters and verbal communications taken as a whole do not manifest an unequivocal demand for self-representation." *Id.* at 6 (quotation omitted). The district court, after a *de novo* review of Fields' contention, found "that the Magistrate Judge's analyses of the facts and law [were] correct" and accepted the magistrate judge's recommendation that Fields' petition be denied. *Fields v. Murray,* No. 91–100–N, slip op. at 2 (E.D. Va. July 10, 1991).[7]

## II.

We first address the application of the Sixth and Fourteenth Amendments which the dissent argues requires that a defendant in a state criminal trial be permitted to proceed *pro se,* apparently without any restraints on such right, despite the presence of special circumstances in this case. *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). Invocation of this right of self-representation, however, poses a peculiar problem: it requires that the defendant waive his right to counsel. "Of the two [rights], the right to be represented by counsel is preeminent," *United States v. Gillis,* 773 F.2d 549, 559 (4th Cir. 1985); *see Tuitt v. Fair,* 822 F.2d 166, 174 (1st Cir.) ("[T]he nature of the two rights makes it reasonable to favor the right to counsel which, if denied, leaves the average defendant helpless."), *cert. denied,* 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987); indeed, "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have," *Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988); *see United States v. Yagow,* 953 F.2d 427, 431 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 103, 121 L.Ed.2d 62 (1992).

---

**6.** Fields was acquitted on the sodomy and rape counts; the sixth aggravated sexual battery count on which Fields was originally charged was stricken from the indictment.

**7.** It is of interest that the record in this case was reviewed at three levels of the state court (the trial court, the court of appeals, and the Su-

preme Court of Virginia) and twice in the federal courts (by the Federal Magistrate Judge and the District Judge) and all agreed that the only thing Fields wanted was the right to cross-examine the children whom it is charged he abused and that there had never been a clear and unequivocal demand for a right to conduct this defense.

So important is the right to counsel that the Supreme Court has instructed courts to "indulge in every reasonable presumption against [its] waiver." *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *see United States v. Weisz,* 718 F.2d 413, 425 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). As a result, a defendant who desires to invoke his right to self-representation, thereby waiving his right to counsel, must do so "clearly and unequivocally." *United States v. Reddeck,* 22 F.3d 1504, 1510 (10th Cir.1994); *accord Stano v. Dugger,* 921 F.2d 1125, 1144 (11th Cir.) (*en banc*), *cert. denied,* 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991); *United States v. Lorick,* 753 F.2d 1295, 1298 (4th Cir.), *cert. denied,* 471 U.S. 1107, 105 S.Ct. 2342, 85 L.Ed.2d 857 (1985); *McNamara v. Riddle,* 563 F.2d 125, 127 (4th Cir.1977).

This requirement that a defendant invoke his self-representation right clearly and unequivocally also serves an additional purpose. A trial court evaluating a defendant's request to represent himself must "traverse ... a thin line" between improperly allowing the defendant to proceed *pro se,* thereby violating his right to counsel, and improperly having the defendant proceed with counsel, thereby violating his right to self-representation. *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990); *see Reese v. Nix,* 942 F.2d 1276, 1280 (8th Cir. 1991), *cert. denied,* 502 U.S. 1113, 112 S.Ct. 1220, 117 L.Ed.2d 457 (1992); *Adams v. Carroll,* 875 F.2d 1441, 1444 (9th Cir.1989). A skillful defendant could manipulate this dilemma to create reversible error. *Cross,* 893 F.2d at 1290; *Adams,* 875 F.2d at 1444; *Tuitt,* 822 F.2d at 175. The requirement that a defendant invoke his self-representation right clearly and unequivocally greatly aids the trial court in resolving this dilemma by allowing the court safely to presume that the defendant should proceed with counsel

absent an unmistakable expression by the defendant that so to proceed is contrary to his wishes. *Cross,* 893 F.2d at 1290; *Adams,* 875 F.2d at 1444; *Tuitt,* 822 F.2d at 175.

■ Before analyzing the state court's finding that Fields failed to invoke his self-representation right clearly and unequivocally, we must first address the proper standard under which to review this finding. As Fields' case reaches us on habeas, we review the state court's findings on questions of fact under the "presumption of correctness" set forth in 28 U.S.C. § 2254(d); the state court's findings on mixed questions of fact and law we consider *de novo. Miller v. Fenton,* 474 U.S. 104, 111–12, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985); *Wainwright v. Witt,* 469 U.S. 412, 428 & n. 8, 105 S.Ct. 844, 854 & n. 8, 83 L.Ed.2d 841 (1985).[8]

The Supreme Court's most complete discussion of the appropriate methodology for distinguishing these two types of questions is contained in *Miller.* There the Court stated:

> At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.

*Miller,* 474 U.S. at 114, 106 S.Ct. at 451.

"[F]or example," the Court indicated, it was more likely to classify a question as a question of law or as a mixed question of fact and law, both reviewable *de novo,* when "the relevant legal principle [could] be given meaning only through its application to the particular circumstances of a case," or when, due to the nature of the question, "federal or appellate review [would serve] as a means of compensating for perceived shortcomings of the trier of fact by way of bias or some other factor." *Id.* (quotation omitted). When, the Court contrasted, "the issue involves the

---

8. In a recent plurality opinion, Justice Thomas noted that while Supreme Court cases had reviewed mixed questions of fact and law *de novo,* "in none of our leading cases was the choice between a *de novo* and a deferential standard outcome determinative." *Wright v. West,* ——

U.S. ——, —— n. 6, 112 S.Ct. 2482, 2489 n. 6, 120 L.Ed.2d 225 (1992). Be that as it may, absent further instruction from the Supreme Court, we must review these mixed questions under the *de novo* standard that has been applied by the Court.

credibility of witnesses" and, therefore, "the state trial judge is in a position to assess [it] that is far superior to that of federal judges reviewing an application for a writ of habeas corpus," *id.,* "there are compelling and familiar justifications for leaving the process of applying law to fact to the [state] trial court and according its determinations presumptive weight," *id.;* as a result, such an issue "merits treatment as a 'factual issue' within the meaning of § 2254(d)," *id.* at 114–15, 106 S.Ct. at 452.

Applying this methodology to the case before it, the Court concluded that whether a confession was voluntary was a mixed question of fact and law reviewable *de novo.* *Id.* at 115, 106 S.Ct. at 452. It explained that "the voluntariness of a confession has always had a uniquely legal dimension" because "the voluntariness inquiry ... subsum[es] ... a complex of values;" this "militates against treating the question as one of simple historical fact," *id.* at 116, 106 S.Ct. at 452–53 (quotation omitted). In addition, the Court indicated, as "assessments of credibility and demeanor are not crucial" in determining whether a confession was voluntary, *id.* at 116–17, 106 S.Ct. at 453, "the state-court judge [was] not in an appreciably better position than the federal habeas court to make that determination," *Id.* at 117, 106 S.Ct. at 453. Finally, the Court noted that "the critical events surrounding the taking of a confession" do not "take place in open court on a full record," but "almost invariably occur in a secret and inherently more coercive environment," *id.;* these circumstances, "together with the inevitable and understandable reluctance to exclude an otherwise reliable admission of guilt," *id.* at 117, 106 S.Ct. at 453, "elevate[d] the risk that erroneous resolution of the voluntariness question might inadvertently frustrate the protection of the federal right," *id.*

■ *Miller,* distilled, sets forth that, at least in the absence of a statement by Congress, a question should be classified as one of fact or of fact and law mixed based on which "judicial actor is better positioned ... to decide [it]," *id.* at 114, 106 S.Ct. at 451; questions which the federal habeas court is better positioned to decide should be classi-

fied as mixed questions of fact and law and reviewed *de novo,* while questions which "the state trial judge is in a [better] position to assess" should be treated as questions of fact and reviewed under section 2254(d)'s presumption of correctness, *id.* Three factors should be examined in determining whether the federal habeas court or the state court is better positioned to decide the question: first, whether the legal standard to be applied is complex or simple and straightforward, *id.* at 114, 115–16, 106 S.Ct. at 451, 452–53; second, whether observing the state trial court proceedings is important in resolving the question, *id.* at 114, 116–17, 106 S.Ct. at 451, 453; third, whether allowing the state court to decide the question poses an "elevate[d] ... risk," *id.* at 117, 106 S.Ct. at 453, because of "bias or some other factor," *id.* at 114, 106 S.Ct. at 451, that the constitutional right at issue will not be properly protected, *id.* at 117, 106 S.Ct. at 453.

The methodology set forth in *Miller* for distinguishing questions of fact from mixed questions of fact and law sheds light on the Court's other decisions in this area, an area in which the Court has acknowledged that it "has not charted an entirely clear course." *Id.* at 113, 106 S.Ct. at 451. In *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985), and *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), for example, the Court held that the question of whether jurors were biased, in violation of the defendant's Sixth Amendment right to an impartial jury, was one of fact. The Court stated: "The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the 'factual issues' that are subject to § 2254(d)." *Wainwright,* 469 U.S. at 429, 105 S.Ct. at 855. In addition, the Court later noted that the state court's "determination of juror bias ... take[s] place in open court on a full record " and, for that reason, serves as an example of a determination to which the federal habeas court can defer without an elevated risk to the defendant's constitutional rights. *Miller,* 474 U.S. at 117, 106 S.Ct. at 453.

In a similar vein lie *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990), and *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983), where the Court held that whether a defendant was competent, respectively, to waive post-conviction relief or to stand trial were questions of fact. The state court's position in having observed the defendant during the trial court proceedings gives it an advantage over the federal habeas court in determining whether the defendant is competent. *Miller,* 474 U.S. at 116–17, 106 S.Ct. at 453. Further, as "the adjudication of competency ... take[s] place in open court on a full record," there is not an elevated risk that deference to the state court's competency determination will leave the defendant's constitutional rights unprotected. *Id.* at 117, 106 S.Ct. at 453.

With *Miller*'s methodology in mind, we turn to classifying the question at issue here, whether Fields effectively invoked his right to self-representation, as one of fact or one of fact and law mixed. On *Miller*'s first factor, the legal standard to be applied in resolving the question is whether the defendant expressed his desire to proceed *pro se* "clearly and unequivocally." Applying this standard is simple and straightforward, for clarity and unequivocality are not sophisticated legal concepts but common, ordinary terms easily understood by a layman; by contrast, the standard is not comprised of "a complex of values," as is the standard for determining whether a confession is voluntary, *id.* at 116, 106 S.Ct. at 453.

■ Observation of the state trial court proceedings is important in resolving whether the defendant clearly and unequivocally expressed his desire to proceed *pro se, Miller*'s second factor. The clarity and unequivocality of a defendant's expression is determined not only by the words he speaks, but by his way of speaking them and his manner and demeanor when he is speaking; undeniably, the same words can express different degrees of certainty depending on how they are spoken. A transcript of the state trial court proceedings can reveal neither the way a defendant spoke when he indicated his desire to represent himself nor the manner

and demeanor he assumed at the time of this indication.

As to *Miller*'s third factor, allowing a state court to determine whether a defendant clearly and unequivocally expressed his desire to proceed *pro se* does not pose an "elevate[d] ... risk" that the defendant's constitutional right at issue, his right to self-representation, will not be properly protected. The primary consideration in evaluating whether there is elevated risk to the constitutional right at issue is the location where the critical events to be examined by the court occurred, *id.* at 117, 106 S.Ct. at 453; thus, *Miller* found an elevated risk when a state court determined the voluntariness of a confession because "the critical events surrounding the taking of a confession almost invariably occur in a secret ... coercive environment," *id.,* while distinguishing cases where the critical events to be examined by the court "take place in open court on a full record," *id.* The critical event examined by the state court in determining whether a defendant clearly and unequivocally expressed his desire to proceed *pro se* is the defendant's expression of that desire, and that expression should "take place in open court on a full record," *id.*

Another consideration in deciding whether allowing a state court to determine the question at issue poses an elevated risk to the defendant's constitutional right is whether the state court is likely to be biased against the defendant in its determination. A state court is unlikely to be affected by bias in determining whether a defendant clearly and unequivocally invoked his right to self-representation. This is not a determination where resolution in the defendant's favor will increase the probability of an acquittal, as in a state court determination of whether a confession is voluntary, *see id.* at 117, 106 S.Ct. at 453; rather, a determination in the defendant's favor here means that he represents himself which, if anything, is more likely to produce a conviction, *see McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984) ("[T]he right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defen-

dant...."). Of course, some state courts may prefer, for the sake of efficient administration of the trial, that the defendant proceed with counsel, but this possible preference alone is insufficient to justify a finding that state court determination of whether the defendant effectively invoked his self-representation right poses an elevated risk to this right.

In sum, then, with regard to the question of whether a defendant effectively invoked his right to self-representation, we find that the legal standard to be applied is simple and straightforward, that observing the state trial court proceedings is important in resolving the question, and that allowing the state court to determine the question does not pose an elevated risk to the defendant's self-representation right. As a result, under *Miller*, we conclude that the question is one of fact and, therefore, that the state court's finding on the question is reviewed under section 2254(d)'s "presumption of correctness."

Our conclusion is supported by the decisions of the only other courts of appeals to address the issue. In *Cain v. Peters*, 972 F.2d 748, 749 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1310, 122 L.Ed.2d 698 (1993), and *Hamilton v. Groose*, 28 F.3d 859, 862 (8th Cir.1994), the Seventh and Eighth Circuits both held that whether a defendant "clearly and unequivocally" invoked his right to self-representation was a question of fact and, therefore, the state court's finding on it was reviewed by the federal habeas court under section 2254(d).[9]

 Section 2254(d) commands that a state court's determination on a question of fact "shall be presumed to be correct," 28 U.S.C. § 2254(d), unless one of eight "enumerated reasons for avoiding the presumption is present," *Wainwright*, 469 U.S. at 431, 105 S.Ct. at 856.[10] Reasons one through seven are plainly inapplicable, *see* 28 U.S.C. § 2254(d)(1)-(7);[11] thus, we can only overturn

---

9. Our conclusion and the conclusions of the Eighth and Seventh Circuits in *Hamilton* and *Cain* do not conflict with the Supreme Court's decision in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). *Brewer* held that the question of whether a defendant waived his right to counsel before a police officer interrogated him was a mixed question of fact and law. *Brewer*, 430 U.S. at 397 n. 4, 403–04, 97 S.Ct. at 1238–39 n. 4, 1242. *Miller*'s methodology for distinguishing questions of fact and mixed questions of fact and law, however, applies quite differently to the question at issue in *Brewer* and the question at issue here. Moreover, *Miller* itself called into question the continuing validity of *Brewer*'s holding because it specifically noted a lower court decision that a state court finding on whether a defendant waived his *Miranda* rights was entitled to the section 2254(d) presumption, and then stated "[t]he present case presents no occasion for us to address the question whether federal habeas courts must accord the statutory presumption of correctness to state-court findings concerning the validity of a waiver." *Miller*, 474 U.S. at 108 n. 3, 106 S.Ct. at 448 n. 3. *See Perri v. Director, Dep't of Corrections*, 817 F.2d 448, 450–51 (7th Cir.) (noting that *Miller*'s footnote three called into question *Brewer*'s holding), *cert. denied*, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). And this Court has held after *Brewer* that a state court finding on the question of whether a defendant voluntarily waived his right to counsel was a finding of fact reviewable under the section 2254(d) presumption of correctness. *Murphy v. Holland*, 776 F.2d 470, 482 (4th Cir.1985), *vacated on other*

grounds, 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 334 (1986).

10. The plainest finding by the Virginia state courts that Fields failed to invoke his right to self-representation clearly and unequivocally was made by the Court of Appeals of Virginia in its review of Field's conviction. Its finding, however, is just as entitled to section 2254(d)'s presumption of correctness as is a finding by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

11. Fields suggests that section 2254(d)(1) applies because the state court's finding here did not decide "the relevant factual issue." Supp. Br. for Appellant at 11. The Court of Appeals of Virginia stated that to trigger the self-representation right,

> the defendant must knowingly waive his right to counsel by clear and unequivocal assertion of the right to self-representation.... The record, however, contains no clear and unequivocal waiver of counsel. To the contrary, the record shows that [Fields] wanted, and repeatedly requested, permission only to conduct cross-examination.

*Fields v. Commonwealth*, slip op. at 3. Fields points out that the court of appeals then continued: "He also never represented to the court that he was competent to conduct his own defense." *Id.* He argues that the court of appeals never found that he failed to assert clearly and unequivocally his right to self-representation, but

the state court's finding that Fields failed to invoke his right to self-representation clearly and unequivocally if it is "not fairly supported by the record," 28 U.S.C. § 2254(d)(8). Such a review compels us to accord the state court's finding "a high measure of deference." *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983); *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record." *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); *see Wainwright,* 469 U.S. at 434, 105 S.Ct. at 857.

■ Applying this "high measure of deference," *Rushen,* 464 U.S. at 120, 104 S.Ct. at 456, we cannot conclude that the state court's finding that Fields failed to invoke his right to self-representation clearly and unequivocally "lacked even 'fair support' in the record," *Lonberger,* 459 U.S. at 432, 103 S.Ct. at 850. Over the course of his three letters and his subsequent hearing before the state trial court, Fields only mentioned the possibility of proceeding *pro se* at one point, in his third letter to Judge Smith. There, in the midst of complaining about the performance of his counsel and expressing his dismay that the court had not approved his request for new counsel, Fields stated: "I have no choice left but to dismiss Mr. Labell and Mr. Segall as my council [sic] and act as my own council [sic] at the trial." Shortly after the statement he added: "In July of this year the Supreme Court affirmed my right to face my accusers...." This suggests that he may have been thinking about simply cross-examining personally the witnesses against him,

rather than proceeding *pro se.* Moreover, even if he did intend to express a desire to proceed *pro se,* he indicated later in the same letter that he "regret[ted] taking this action." He had previously informed the trial court that he was "reluctan[t]" even to act as co-counsel "since [his] knowledge of the law [was] limited," and acknowledged to the trial court that he had "a learning disability and related attention span defect [sic]."

Most significantly, when the trial court held a hearing to address Fields' letters, Fields never once expressed any desire to represent himself. When the trial court asked, "[w]hat seems to be your problem," Fields responded that he had "no contact with [his] attorneys." When the trial court inquired, "[d]on't you think these two attorneys are better suited for what ought to be brought up in your case and what ought not to be brought up," Fields agreed "[i]n some respects." When the trial court queried, "why do you think I should relieve Mr. Labell and Mr. Segall from your case when your case is set October 3rd and 4th and you say you want a speedy trial? Anybody that gets in it now is certainly going to want a continuance in all probability," Fields replied that "I am not aware that they've really done that much since April since the hearing." Missing from all of these responses, and indeed from the entire hearing, is any expression whatsoever from Fields that he desired to proceed *pro se.*

The record taken as a whole, therefore, discloses only a single statement in one letter from Fields that perhaps indicated a desire to proceed *pro se,* although it is not entirely clear that Fields intended it as such. In the same letter, Fields expressed "regret [about] taking this action," and had earlier informed the trial court of his "reluctance" even to act as co-counsel. Further, at a subsequent

determined only that he did not waive his right to counsel and that he did not adequately indicate that he was competent to exercise his *pro se* right.

We reject this argument. The Court of Appeals plainly did find that he failed to invoke clearly and unequivocally his right to self-representation. It stated that to trigger the self-representation right, "the defendant must knowingly waive his right to counsel by clear and unequivocal assertion of his right to self-representation....

The record, however, contains no clear and unequivocal waiver of counsel." *Id.* In other words, the Court of Appeals indicated that a defendant waives his right to counsel by clearly and unequivocally invoking his self-representation right, and found that Fields had not so waived his right to counsel. As to the Court of Appeals' later statement that Fields never represented that he was competent to conduct his own defense, we must construe it as an additional finding.

hearing to address his letters, Fields never once indicated that he wished to represent himself. We cannot find, on these facts, that the state court's determination that Fields failed to invoke his right to self-representation clearly and unequivocally "lacked even 'fair support' in the record," *Lonberger*, 459 U.S. at 432, 103 S.Ct. at 850.

The findings of the other courts who have examined this same record strongly bolster our conclusion. Three different courts have conducted four independent, *de novo* reviews of Fields' contention,[12] and all have determined that Fields failed to invoke his right to self-representation clearly and unequivocally. It would be difficult indeed to hold not merely that we "simply disagree," *id.*, with the four independent determinations of these three courts, but that all of their determinations "lacked even 'fair support' in the record." *Id.*

Because we cannot conclude that it lacked even fair support in the record, the state court's finding that Fields failed to invoke his right to self-representation clearly and unequivocally must be upheld. We hold, therefore, that the district court did not err in determining that Fields' right to self-representation was not violated and denying Fields' habeas petition.

### III.

■ Even if Fields did invoke his self-representation right clearly and unequivocally, the state trial court committed no error. Fields concedes that he desired to proceed *pro se* for only one purpose: to cross-examine personally the young girls, including his daughter, who were witnesses against him. Br. for Appellant at 14 ("Fields invoked his right to self-representation as part of a calculated defense strategy: He demanded to represent himself so that he could personally cross-examine the witnesses . . . ."). The trial court refused to allow such personal cross-examination, offering instead that Fields could write out the questions that he wished to ask the girls and have them read by a lawyer. Because the trial court was not required to allow such personal cross-examination, Fields was denied nothing to which he was entitled.

Our analysis of whether the state trial court properly prevented Fields from cross-examining the young girls who were witnesses against him begins with the Supreme Court's opinion in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Court in *Craig* addressed the constitutionality of a state statute that allowed child victims of sexual abuse to testify against their alleged abuser out of his presence and outside of the courtroom by one-way closed circuit television. It held that a defendant's Confrontation Clause right can be restricted by preventing him from confronting face-to-face the witnesses against him, which is one "element" of this right, if, first, the purpose of the Confrontation Clause, ensuring "the reliability of the testimony," is "otherwise assured" and, second, the "denial of such [face-to-face] confrontation is necessary to further an important public policy." *Id.* at 850, 110 S.Ct. at 3166.

The Court found, on the first prong, that the statute "adequately ensure[d]" the reliability of the child witnesses' testimony because, while it eliminated the defendant's face-to-face confrontation with the witnesses, it preserved the "other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor [by the jury]." *Id.* at 851, 110 S.Ct. at 3166. On the second prong, the Court determined that "a State's interest in the physical and psychological well-being of child abuse victims" was "sufficiently important to outweigh . . . a defendant's right to face his or her accusers in court" if denial of this face-to-face confrontation was necessary to protect the children from "emotional trauma." *Id.* at 853–55, 110 S.Ct. at 3167–68. The Court instructed that to find adequately that denial of face-to-face confrontation was necessary to protect the children from emotional trauma, the state court must "hear evidence," *id.* at 855, 110 S.Ct. at 3169, and conclude that each child would be traumatized "by the presence of the

---

12. The three courts are the Court of Appeals of Virginia, the Supreme Court of Virginia, and the United States District Court for the Eastern District of Virginia, where the record was reviewed both by a magistrate judge and a district judge.

defendant," *id.* at 856, 110 S.Ct. at 3169. Because the state statute required such a finding before denying face-to-face confrontation, the Court upheld its constitutionality. *Id.* at 857, 110 S.Ct. at 3169–70.

If a defendant's Confrontation Clause right can be limited in the manner provided in *Craig*, we have little doubt that a defendant's self-representation right can be similarly limited. While the Confrontation Clause right is guaranteed explicitly in the Sixth Amendment, U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."), the self-representation right is only implicit in that Amendment, *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). The self-representation right was only firmly established in 1975 in *Faretta*, and then only over the dissent of three justices, *id.* at 836, 95 S.Ct. at 2542 (Burger, C.J., dissenting, joined by Blackmun and Rehnquist, JJ.). Moreover, it is universally recognized that the self-representation right is not absolute. *See, e.g., McKaskle v. Wiggins*, 465 U.S. 168, 176–77, 104 S.Ct. 944, 950, 79 L.Ed.2d 122 (1984); *Bassette v. Thompson*, 915 F.2d 932, 941 (4th Cir.1990), *cert. denied*, 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

█ We must, therefore, apply *Craig*'s analysis to determine whether the state trial court was constitutionally required to allow Fields to cross-examine personally the young girls who were witnesses against him. Under this analysis, Fields' self-representation right could have been properly restricted by preventing him from cross-examining personally some of the witnesses against him, which is one "element" of the self-representation right, if, first, the purposes of the self-representation right would have been otherwise assured and, second, the denial of such personal cross-examination was necessary to further an important public policy.

On the first prong, the purposes of the self-representation right are to allow the defendant "to affirm [his] dignity and autonomy" and to present what he believes is his "best possible defense." *McKaskle*, 465 U.S. at 176–78, 104 S.Ct. at 950–51. Just as the Court in *Craig* determined that the purpose

of the defendant's Confrontation Clause right, ensuring the reliability of the testimony, was "otherwise assured" when one element of the right, face-to-face confrontation with the witnesses, was denied but the other elements of the right, oath, cross-examination, and observation of the witness' demeanor by the jury, were preserved, *Craig*, 497 U.S. at 850–51, 110 S.Ct. at 3166, we find that the purposes of the self-representation right would have been otherwise assured in the case at bar had Fields been tried *pro se* and prevented from cross-examining the girls who were witnesses against him.

The elements of a defendant's self-representation right include "control[ling] the organization and content of his own defense, ... mak[ing] motions, ... argu[ing] points of law, ... participat[ing] in the *voir dire*, ... question[ing] witnesses, and ... address[ing] the court and the jury at appropriate points in the trial." *McKaskle*, 465 U.S. at 174, 104 S.Ct. at 949. As in *Craig*, one of these numerous elements, the right to question, or cross-examine, certain witnesses personally, was denied to Fields while the others would have been preserved. Denying personal cross-examination may have inhibited Fields' dignity and autonomy to some degree by affecting "the jury's perception that [he was] representing himself," *id.* at 178, 104 S.Ct. at 951, but, as he would have conducted every other portion of the trial, his dignity and autonomy would have been "otherwise assured." *Craig*, 497 U.S. at 850, 110 S.Ct. at 3166; *see McKaskle*, 465 U.S. at 182, 104 S.Ct. at 953 (allowing trial court to require standby counsel for *pro se* defendant even though it "may erode the dignitary values the right to self-representation is intended to promote"). Similarly, while Fields' ability to present his chosen defense may have been reduced slightly by not being allowed personally to cross-examine the girls, it would have been otherwise assured because he could have personally presented his defense in every other portion of the trial and could even have controlled the cross-examination by specifying the questions to be asked. As a result, we are convinced that the purposes of the self-representation right were better "otherwise assured" here, despite the denial

of personal cross-examination, than was the purpose of the Confrontation Clause right in *Craig* when the defendant was denied face-to-face confrontation with the witnesses.

As to *Craig*'s second prong, the State had an extremely important interest in preventing Fields from personally cross-examining the young ·girls here. The Court in *Craig* determined that "a State's interest in the physical and psychological well-being of child abuse victims" was "sufficiently important to outweigh ... a defendant's right to face his or her accusers in court" if denial of this face-to-face confrontation was necessary to protect the children from "emotional trauma." *Craig,* 497 U.S. at 853–55, 110 S.Ct. at 3167–69. The State's interest here in protecting child sexual abuse victims from the emotional trauma of being cross-examined by their alleged abuser is at least as great as, and likely greater than, the State's interest in *Craig* of protecting children from the emotional harm of merely having to testify in their alleged abuser's presence. We have little trouble determining, therefore, that the State's interest here was sufficiently important to outweigh Fields' right to cross-examine personally witnesses against him if denial of this cross-examination was necessary to protect the young girls from emotional trauma.

This determination accords with those of other courts who have considered the issue. *See State v. Taylor,* 562 A.2d 445, 454 (R.I. 1989) (holding that a defendant charged with abusing a child could be denied the right personally to cross-examine the victims when such cross-examination would harm victims); *State v. Estabrook,* 68 Wash.App. 309, 842 P.2d 1001, 1006 (same), *review denied,* 121 Wash.2d 1024, 854 P.2d 1084 (1993); *cf. Commonwealth v. Conefrey,* 410 Mass. 1, 570 N.E.2d 1384, 1390–91 (1991) (refusing to reach issue because trial court failed to make adequate finding that personal cross-examination would harm child victims).

The trial court here found that preventing Fields · from cross-examining the girls who were witnesses against him was necessary to protect the girls from emotional trauma. In making this finding, it had before it the indictment, which charged Fields with raping, sodomizing, and sexually battering these girls, aged eleven through thirteen, one of whom was his daughter. It also had before it Fields' first letter, which stated that all of these girls "call[ed] him dad," and that he had treated them "as if they were [his]·own kids." This letter admitted that one of these girls had "burst into tears" at a preliminary hearing "because she was embarrassed" and that the same girl "had wet the bed repeatedly." Further, Fields declared in this letter that in cross-examining the girls he would "not approach them closer than three · feet and ... would request the courts [sic] permission if for some reason he needed to get closer;" despite Fields' protestations to the contrary, it can be inferred from this statement that Fields' intention in the cross-examination was to intimidate the girls, especially given their close relationship to him. We think it reasonable for the trial court to have concluded on the basis of the facts before it that these eleven through thirteen-year-old girls who had experienced repeated sexual abuse would be emotionally harmed if they were personally cross-examined in open court. by Fields, their alleged abuser. We therefore find adequate the trial court's determination that denial of this personal cross-examination was necessary to prevent emotional trauma to the girls.

■ We recognize that it may be argued *Craig* requires a more elaborate finding by . the trial court that denial of face-to-face confrontation was necessary to prevent emotional harm to the child witnesses; the Court in *Craig* indicated that the trial court should "hear evidence," *Craig,* 497 U.S. at 855, 110 S.Ct. at 3169, and conclude whether each child would be traumatized "by the presence of the defendant" in the courtroom during her testimony, *id.* at 856, 110 S.Ct. at 3169. The case at bar is different however. It is far less difficult to conclude that a child sexual abuse victim will be emotionally harmed by being personally cross-examined by her alleged abuser than by being required merely to testify in his presence. Further, the right denied here, that of cross-examining witnesses personally, lacks the fundamental importance of the right denied in *Craig,* that of confronting adverse witnesses

face-to-face. As a result, we do not believe it was essential in this case that psychological evidence of the probable emotional harm to each of the girls be presented in order for the trial court to find that denying Fields personal cross-examination was necessary to protect them.[13]

In sum, the purposes of Fields' self-representation right, to allow Fields to affirm his dignity and autonomy and to present what he believes is his best possible defense, would have been "otherwise assured," *Craig*, 497 U.S. at 850, 110 S.Ct. at 3166, even though he was prevented from cross-examining personally the girls who were witnesses against him.

Further, the trial court adequately found that preventing this cross-examination was necessary to further the State's important interest in protecting child sexual abuse victims from further trauma. Under *Craig*, therefore, the trial court was not required to allow Fields to cross-examine personally the girls who were witnesses against him. Because Fields concedes that this personal cross-examination was his sole purpose in representing himself, the trial court committed no error even if Fields invoked his self-representation right clearly and unequivocally.

### IV.

For the reasons stated, we affirm the district court's denial of Fields' habeas petition.

*AFFIRMED.*

ERVIN, Chief Judge, dissenting:

Based on the evidence presented at trial, there is little doubt that Fields' actions were appalling, but even individuals engaging in horrible acts are afforded protection under our Constitution. In focusing on the moral depravity of Fields' actions, the majority ignores the defendant's clear and unequivocal expression of a desire to represent himself at trial. Such an expression is readily apparent if one reviews the entire record and not merely those portions that make it easier to arrive at a predetermined conclusion. As I demonstrate below, Fields' third letter to Judge Smith was the culmination of a progressive dissatisfaction with his attorneys' assistance and with the judge's refusal to allow him to serve as co-counsel for the purpose of cross-examining his accusers. The most disturbing aspect of the majority opinion is that it establishes new Sixth Amendment law in an alternative holding, spurning any inclination towards judicial restraint. This newly created constitutional rule—that a defendant's right to self-representation can be limited in the same way that Confrontation Clause rights can be limited under *Maryland v. Craig*—is wholly misguided. The court's extension of *Craig* to the self-representation realm undermines the continued vitality of the *Faretta* doctrine. Accordingly, I respectfully dissent.

### I.

Although the majority sketches the facts underlying this petition, I think that it is necessary to state them in greater detail, for they are central to the determination of whether Fields expressed a desire to represent himself. In focusing on isolated statements made by Fields, the majority underestimates the extent to which Fields' request evolved over the course of his dialogue with the district court. *See Majority Opinion,* at 1037 (claiming that Fields "concede[d] that this personal cross-examination was his sole purpose in representing himself"). Although Fields initially wanted to be appointed co-counsel solely for the purpose of conducting cross-examination, his correspondence with the judge—when taken as a whole—reveals other ways in which he was dissatisfied with his counsel. This displeasure culminated in what I believe to have been an absolutely clear communication of his desire to represent himself.

---

13. We also recognize that in *Conefrey*, the Supreme Judicial Court of Massachusetts held insufficient a trial court's finding that denial of personal cross-examination to a *pro se* sexual abuse defendant would harm the child victim/witness where the trial court had before it the facts that the child was eleven, the child was the defendant's daughter, and the defendant was charged with indecent assault and battery. *Conefrey*, 570 N.E.2d at 1390–91. To the extent that *Conefrey* is inconsistent with our holding here, we decline to follow it.

I strongly disagree with the majority's conclusion that "[t]he record taken as a whole, therefore discloses only a single statement in one letter from Fields that perhaps indicated a desire to proceed *pro se* . . . ." *Majority Opinion*, at 1033. Fields wrote three letters to the judge within a three month period and then spoke with the judge during a pretrial hearing held in early September 1988. If the court is truly committed to considering the record as a whole, then each of Fields' remarks about the quality of his counsel and his desire to cross-examine the children must be taken into account.

On June 2, 1988, less than a month after he had been indicted, Fields wrote to the presiding judge in his case. The very first sentence of that letter stated: "I wish to petition the court to be appointed as co-council [sic] for defense at my trial." His desire to participate in his own defense arose because he was unhappy with his attorneys' ability to examine the witnesses effectively. According to Fields, he witnessed perjury at the preliminary hearing. He felt that his attorneys had not mastered the facts of the case and the children would be less likely to lie to an individual they knew. Fields acknowledged that he still would need the advice of his appointed attorneys on technical legal matters—"I would of course need expert legal advice as to what kind of evidence I can present and what kinds of questions I can ask and to qualify expert witnesses for me and listen for evidence which should not be considered relevant and the thousand and one other things they are trained for." There is no indication that the judge responded to this letter.

On August 16, Fields wrote a second letter to the judge in which he outlined some of the ways in which his attorneys were not functioning adequately:

It is now apparent that my council [sic] cannot handle my defense and I hereby relieve them of that duty. Mr. Ordlick Labell and Mr. James Segall are not consulting with me before asking for continuances and I protest this latest postponement most strenuously. It has always been my desire to get to court as soon as possible and I made my attorneys aware of that. Our approaches to my defense has [sic] been on divergent courses and I feel strongly that I will best [sic] served by the court appointing me a new council [sic] who is competent to handle a case of this magnitude.

Fields' criticisms of his attorneys, regardless of whether the criticism was justified, went beyond the issue of who would conduct cross-examination. According to Fields, his attorneys were leaving him out of the decision making process and were preventing him from getting to trial at the earliest possible date. The cross-examination issue and the effectiveness of defense counsel were distinct issues in Fields' mind. In the second page of the letter, Fields wrote the following:

I now petition the court for a new attorney to replace Mr. Labell and Mr. Segall.

I also beg the court to let me know in writing regarding my petition to act as co council [sic] and my petition for dental and medical services.

It is clear that Fields wanted to cross-examine the children himself, as this letter indicates. His "approach ha[d] always been to simply get the remainder of the stories from the witness[es] by questioning them myself on the stand." The dual request made in this second letter demonstrates, however, that Fields was troubled by more than just the cross-examination issue. The desire to cross-examine his accusers increased as his disapproval of his counsel grew.

Fields apparently received a reply from the judge to the second letter, but it is not included either in the state record or in our record on appeal. Judge Smith seems to have indicated that he would not grant Fields' petition for new counsel and would not allow Fields to examine the witnesses at trial. In speaking to Fields at the subsequent hearing, the judge told Fields that "[y]ou can write out your questions and give it to your lawyers if you want to do that which is what I put to you in my letter."

On August 29, 1988, Fields sent his third and final letter to the judge. After thanking the judge for responding to the second letter, Fields stated:

I am very dismayed that my petition for new council [sic] was not approved. Therefore, *I have no choice left but to dismiss Mr. Labell and Mr. Segall as my council [sic] and to act as my own council at the trial.* I believe the law gives me that option and since I am so highly prejudiced against Mr. Labell for his incompetence and procrastination I may yet file a complaint against him with the Virginia Bar Assoc. *I regret taking this action but I am convinced I have no choice.* In July of this year the Supreme Court affirmed my right to face my accusers and I feel that that approach is the only one that guarantees me justice. I heard perjury committed at the hearing and I believe the witnesses would not hesitate to lie again to a stranger. The stranger I am referring to would be any council [sic] asking them questions.

\*　　\*　　\*　　\*　　\*　　\*

I regret putting you in this position your Honor but my future is my responsibility and no one elses. My honor and reputation is my responsibility and no one elses. Without the opportunity to personally defend myself justice will not be served.

If you will have a law clerk or someone appropriate contact me I will give them a list of evidence and witnesses I need.

\*　　\*　　\*　　\*　　\*　　\*

P.S. Mr. Labell has never kept a promise to show up on schedule either, which leads me to believe he has a certain lack of intestinal fortitude. I don't wish to see him again under any circumstances.

(emphasis added). The majority repeatedly cites to Fields' "regret [about] taking this action," *see Majority Opinion,* at 1033, 1034, and suggests that this "reluctance" on Fields' part somehow undermines the defendant's desire to proceed *pro se.* In that part of its opinion which focuses on the defendant's hesitancy and regret, the majority ignores Fields' equally powerful statement that "I am convinced I have no choice [but to dismiss my attorneys]." I cannot understand how the majority can treat this statement, coupled with prior expressions of dissatisfaction

with counsel, as only "perhaps" indicating a desire to proceed *pro se. See id.* at 1033–34.

The court held a pretrial hearing on September 7, 1988, less than two weeks after the court received Fields' third letter. The most noteworthy aspect of the colloquy between Fields and Judge Smith was the repeated insistence on the part of the judge that Fields was "not going to stand up here and cross-examine [his] accusers." While such a decision may have been appropriate in a typical *Maryland v. Craig* dispute, in this case it failed to take into account Fields' assertion of his Sixth Amendment right to self-representation. Moreover, the degree to which the court abhorred the idea of Fields personally cross-examining the girls raises the type of bias concerns that the majority acknowledges are relevant under *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Judge Smith made his feelings clear from the outset of the pretrial hearing:

THE COURT: What seems to be your problem?

THE DEFENDANT: There are several problems, Your Honor. One has been no contact with my attorneys in the past. No verbal contact and—

THE COURT: Well, you indicated to me by letter that you didn't ever want to see him again.

THE DEFENDANT: That's true.

THE COURT: So now you're complaining that you haven't seen him?

THE DEFENDANT: I had no use for him. If they weren't coming over, what the heck were they doing; and when he did come over, I wasn't asked my opinion on what had happened in the case or how I should be approached for the defense. They had already gone off their paths, and my opinions or thoughts just weren't relevant in that.

THE COURT: You haven't got a legal degree have you?

THE DEFENDANT: No, sir.

THE COURT: Don't you think these two attorneys are better suited for what ought to be brought up on your case and what ought not to be brought up?

THE DEFENDANT: In some respects.

THE COURT: *You can forget about my allowing you to cross-examine these complaining witnesses—these young children. I'm not going to allow that under any circumstance.*

THE DEFENDANT: Well then, there won't be any justice in this courtroom.

THE COURT: Well, I can't help that, my friend. If you don't think there'll be, there won't be, but *you're not going to cross-examine the people you're accused of sexually abusing.*

THE DEFENDANT: Well, I believe the Supreme Court gave me that right, your Honor.

THE COURT: *Well, I'm the Supreme Court in your trial, and you're not going to cross-examine those children.* You can write out your questions and give it to your lawyers if you want to do that which is what I put to you in my letter. That's fine, but *you're not going to stand up here and cross-examine your accusers.* You have a right to see your accusers and hear them testify in front of you, and you have a right to cross-examination, but you don't have a right to do it yourself.

THE DEFENDANT: I understood that I really was—a front—that I had the right to confront them, Your Honor.

THE COURT: You're going to confront them through your lawyer; and any questions you want your lawyers to ask, you can write it out and give it to them.

THE DEFENDANT: I've already seen these children commit perjury, Your Honor, and it's something they're going to do with a stranger because they know that that stranger does not have all the facts or know who all the other witnesses were that were present under certain circumstances.

THE COURT: Well, that's your responsibility to get that to your lawyer so that they can properly cross-examine, but I'm ruling on that right now. *You can go to Richmond on that point because you're*

*not going to cross-examine in my court any child that you've allegedly sexually abused.*

At no point during the hearing did Judge Smith consider Fields' desire to cross-examine the children in light of Fields' independent request to proceed as his own counsel. Judge Smith convinced himself, without the benefit of a *Craig* hearing, that any scenario which would place Fields in the position of cross-examiner would not be entertained.

THE COURT: To allow him to stand up here as a father and as a defendant, question a thirteen year old, which is the one I have in front of me—I don't know what—whether the other ones are or not—is inconceivable. I can't think of putting a child any more ill at ease than to have her own defendant father who she's accused of sexually abusing her standing up here and questioning her.

THE DEFENDANT: Your Honor, may I say something?

THE COURT: No. I don't want to hear anymore from you. I want you to cooperate with them, Mr. Fields, because if you don't, it's only going to—it's a detriment; and I'm ruling right now that you're not going to be allowed to question these children.

The discussion then moved on to other matters pertaining to trial.

## II.

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Because "the right to be represented by counsel is preeminent," *United States v. Gillis,* 773 F.2d 549, 559 (4th Cir.1985), proper invocation of the self-representation right requires a defendant to "clearly and unequivocally declare[ ] to the trial judge that he want[s] to represent himself and [does] not want counsel."[1] *Far-*

---

1. The majority cites to Fourth Circuit cases in support of the "clear and unequivocal" standard, but fails to explain how the two cases differ from the present case. *Majority Opinion,* at 1029 (citing *United States v. Lorick,* 753 F.2d 1295, 1298

(4th Cir.), *cert. denied,* 471 U.S. 1107, 105 S.Ct. 2342, 85 L.Ed.2d 857 (1985), and *McNamara v. Riddle,* 563 F.2d 125, 127 (4th Cir.1977)). In *Lorick,* the defendant had claimed that he had a problem dealing with his attorney and wished

etta, 422 U.S. at 835, 95 S.Ct. at 2541. Although we have been instructed to "indulge in every reasonable presumption against waiver" of the right to counsel, *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), at a certain point a defendant's "intentional relinquishment or abandonment of a known right or privilege" requires this court to respect his or her decision. *Id.* The facts of this case do not present a *Brewer*-type scenario in which officers clearly manipulated an escaped mental hospital patient into providing them with key information outside the presence of his counsel. There were no "Christian burial speeches" given in Fields' case; proceeding *pro se* was *his* idea. Neither the court nor defense counsel persuaded him to waive his right to counsel, and his letters and conversation with the judge make clear that he recognized the potential pitfalls of dismissing his attorneys.

A preliminary question, over which the majority opinion labors mightily, is the standard under which we review the question of whether Fields clearly and unequivocally invoked his *Faretta* right. The majority begins by reformulating *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), from a straightforward case explaining why the voluntariness of a confession is not a question of fact entitled to deference under § 2254(d) into an elaborate test to be used in distinguishing between questions of fact and mixed questions of fact and law, an undertaking certainly never stated in the Supreme Court's opinion. Indeed, I find it difficult to discern from the *Miller* opinion the very elements of the test that are relied on so heavily by the majority. The factors to which the majority refers are not from the central analytic discussion of *Miller*, but rather are from a section discussing what the Court termed "practical considerations." *Id.* at 116, 106 S.Ct. at 453.

In *Miller*, the Court found that whether a confession was voluntary was a mixed question of fact and law, and thus not subject to the § 2254(d) presumption. *Id.* at 112–18, 106 S.Ct. at 451–53. I do not read *Miller* to enunciate the test the majority adopts.[2] I

---

"to do this on [his] own." 753 F.2d at 1299. The *Lorick* court recognized that "the course of proceedings as reflected in the record is obviously not the clearest," *id.*, but, nonetheless, held that the defendant had made "an express and unambiguous request," *id.*, that his counsel be removed from the case. Like the majority in today's case, the *McNamara* court concluded that the defendant was not entitled to proceed *pro se.* "The difficulty with [McNamara's] claim," however, was that "he never made a request that his appointed counsel, whom he had specifically requested the trial court to appoint as his counsel, be relieved or that he be allowed to represent himself." 563 F.2d at 127. Not only did Fields make such a request, but Judge Smith effectively ruled on the request when he stated that "I'm going to keep both of you in as his attorneys." A specific request and a subsequent ruling were the two things missing in *McNamara* that prevented the court from concluding that there had been a denial of a constitutional right. *Id.*

2. Even if the majority's three-part test could be divined from *Miller*, neither the second nor third prongs of this test, when applied to the facts of this case, bolster the majority's position. The question facing this court is whether Fields made a clear and unequivocal statement of his desire to proceed *pro se.* Under the second prong of the majority's test, the court must determine "whether observing the state trial court proceedings is important in resolving this question." *Majority Opinion*, at 1029. According to the

majority, "[t]he clarity and unequivocality of a defendant's expression is determined not only by the words he speaks, but by his way of speaking them and his manner and demeanor when he is speaking." *Id.* at 1033. Consideration of such additional factors converts a "clear and unequivocal" standard into a "totality of the circumstances" analysis. I do not dispute the fact that "the same words can express different degrees of certainty depending on how they are spoken." *Id.* If, however, mannerisms, voice inflection and demeanor have to be considered in order to evaluate the certainty with which a statement is made, then, by definition, that statement cannot be regarded as clear and unequivocal. If anything other than Fields' letters to the judge and the trial transcript are needed as interpretive tools, then we will not be operating under a "clear and unequivocal" standard. This court is in as good a position to evaluate the actual statements made by Fields as was the trial court.

Deciding that this court should defer to the judgment of the state trial judge is also inappropriate under the third prong of the majority's test. Allowing Judge Smith to determine the clarity of Fields' expression of the right to represent himself poses an elevated risk of bias. Judge Smith let Fields know that "I'm the Supreme Court in your trial," and five times within one brief exchange with Fields, the judge repeated that Fields would not be permitted to cross-examine the children. The judge's apparent disgust with Fields is most clear in the fifth of

merely note that on many similar matters, courts have found it proper to characterize the matter as a mixed question of law and fact, as they involve "the application of a legal standard to a particular set of facts." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Supreme Court held that a waiver of the right to counsel, which is intertwined with the assertion of the right to self-representation, was a question of federal law not subject to the presumption of § 2254(d). In doing so, it noted that

> the question of waiver was not a question of historical fact, but one which, in the words of Mr. Justice Frankfurter, requires "application of constitutional principles to the facts as found...." *Brown v. Allen,* 344 U.S. 443, 507 [73 S.Ct. 437, 446, 97 L.Ed. 469] (1953) (Frankfurter, J., dissenting).

*Id.* at 403–04, 97 S.Ct. at 1242. There is no dispute over the facts of the case; the contents of the letters and the hearing are the sum and substance of the material facts. Whether these facts disclose a clear and unequivocal intention by Fields sufficient to exercise his Sixth Amendment right to waive the right to counsel and proceed *pro se* is a question of law, not a question of fact. As with the voluntariness of a confession, whether a defendant in a criminal proceeding has clearly and unequivocally chosen not to accept the assistance of counsel and to proceed instead by representing himself is a question that has had a "uniquely legal dimension." *Miller,* 474 U.S. at 116, 106 S.Ct. at 452.

Even if I were to accept the proposition that § 2254(d) imposes a presumption of correctness as to this particular determination, however, the presumption is not irrebuttable, and a review of the facts clearly discloses that the "factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Although the majority valiantly attempts to support its conclusion that Fields did not express his desire to exercise

his *Faretta* right by quoting small pieces of the record, there can be no reasonable conclusion from a full review of the facts but that Fields explicitly expressed his right to represent himself.

A steady progression can be noted in the three letters that Fields sent to the judge. In the first, he indicated his dissatisfaction with his appointed counsel and asked to be appointed co-counsel. In the second, written after he had not received any response from the judge, he expressed a desire to obtain new counsel and repeated his request to act as co-counsel. Importantly, both letters referred to other concerns that Fields had with his counsel beyond the cross-examination issue. The judge responded by stating that he was not going to replace current counsel and that Fields would only be able to participate in the cross-examination of witnesses through his counsel. In his third letter, Fields then stated a new position explicitly: "I am very dismayed that my petition for new council [sic] was not approved. Therefore, I have no choice left but to dismiss Mr. Labell and Mr. Segall as my council [sic] and to act as my own council [sic] at the trial." This was not bluster, as the majority seems to believe; that Fields was serious is quite evident from other parts of this letter, in which he informed the judge that "I regret putting you in this position Your Honor but my future is my responsibility and no one elses. My honor and reputation is my responsibility and no one elses. Without the opportunity to personally defend myself justice will not be served." He also noted: "If you will have a law clerk or someone appropriate contact me I will give them a list of evidence and witnesses I need." Thus, there can be no other conclusion but that, after being rebuffed in his attempt to obtain counsel more to his liking, Fields decided that his best course would be to act as his own counsel. That he was forced to take this position as a fallback does not detract from the fact that Fields explicitly conveyed a desire to represent himself. *Cf. United States v. Rob-*

these remarks, when he stated that "[y]ou can go to Richmond on that point because you're not going to cross-examine in my court any child that you've allegedly sexually abused." Judge

Smith's strong feelings about the cross-examination issue increased the risk that a decision on the self-representation matter would not be given serious independent consideration.

*inson,* 913 F.2d 712, 714 (9th Cir.1990) (finding that the "fact that some of Robinson's statements of his preference to proceed pro se were accompanied by expressions of his feeling 'forced' to do so does not render these statements equivocal)"; *Adams v. Carroll,* 875 F.2d 1441, 1442 (9th Cir.1989) (defendant's desire to invoke self-representation right was not unequivocal just because it was impelled by his dislike of his particular attorney; defendant properly invoked right through statement that "[i]f I can't have another lawyer, I will have to go pro per [sic]").

At key points in its opinion the majority overstates Fields' hesitation about relieving his counsel from duty. Twice, within one three paragraph space, the majority quotes Fields as having stated that he "regret[ted]" dismissing his counsel. *Majority Opinion,* at 1033, 1034. The majority ignores the remainder of the *very* sentence in which Fields expressed this regret, in which he stated, quite emphatically: "I am convinced I have no choice." At no point does the majority make its motives clearer than when it places its own spin on Fields' statement that the Supreme Court recently "affirmed [his] right to face [his] accusers." According to the majority, "[t]his suggests that [Fields] may have been thinking about simply cross-examining personally the witnesses against him, rather than proceeding *pro se." Majority Opinion,* at 1033. I believe that it is far more likely that Fields had independent reasons for dismissing his counsel aside from the cross-examination issue. Fields' very next statement after expressing his desire to dismiss Labell and Segall was that he was "highly prejudiced against Mr. Labell for his incompetence and procrastination." The merit of these criticisms is of no concern to this court. All that matters for purposes of this appeal is that Fields articulated an express dissatisfaction with his counsel.

The majority offers no evidence to support its claim that Fields did not really mean what he said. Moreover, it appears as though the majority is deserting the "clear and unequivocal" test on which it relied so heavily in other portions of its opinion. It is a real stretch on the majority's part to read so much into two rather simple statements. Finally, Fields' expression of reluctance to serve as co-counsel came in his first letter to the trial court. At no point after that initial correspondence did Fields ever claim that he was reluctant to proceed *pro se.* Nearly three months passed between the court's receipt of Fields' first letter and receipt of his third letter, in which he clearly stated that he wished to dismiss his counsel. As his counsel continued to fall short of his expectations, Fields grew more and more dissatisfied and, apparently, increasingly convinced that he needed to handle his defense himself.

Both Judge Smith and Labell recognized that Fields had expressed a desire to represent himself. Labell told the judge that Fields "would like to represent himself with us as mere legal advisors," assuming that he would not be permitted to serve as co-counsel for the purposes of cross-examining his accusers. In response, Judge Smith acknowledged that he was under a similar impression, but concluded he was "going to keep both of you in as attorneys." Essentially, representation was forced upon Fields even though all relevant actors knew the defendant wanted to act as his own counsel.

The majority makes much of the fact that the pretrial hearing opened with a discussion regarding the competency of the lawyers, suggesting this demonstrates that Fields had abandoned his desire to represent himself. But one aspect of self-representation is that the defendant must waive the right to the assistance of counsel, and before a court can find such a waiver, it must determine that the waiver is made knowingly.

Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

*Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). The judge's comments to Fields

asking whether Fields had a legal degree and whether he thought the lawyers would do a better job seem to be part of the normal waiver colloquy that occurs after the threshold *Faretta* invocation has been made. *See, e.g., United States v. Gallop,* 838 F.2d 105, 110 (4th Cir.) ("The district judges also should develop on the record the educational background, age and general capabilities of an accused . . . ." (internal quotation and citation omitted)), *cert. denied,* 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.1990) ("Once the right to self-representation has been invoked initially, the trial court must conduct a hearing or engage the defendant in a colloquy to ensure that the defendant's decision is made knowingly, voluntarily, and intelligently."). Thus, contrary to the majority's assertions, every indication is that both the trial judge and Fields' lawyers understood that Fields wished to represent himself. That he did not subsequently succeed in doing so cannot be laid at Fields' feet for failing to be clear about what he wanted, but instead must be laid at the feet of the judge, who told Fields once in a letter and at least five times during the pretrial hearing that Fields would not be allowed to exercise his Sixth Amendment right to represent himself in order to examine the main witnesses at his own trial.

Fields clearly expressed his desire to represent himself, both in the third letter he wrote to the judge and in the subsequent hearing. All the evidence demonstrates that the participants understood what Fields wanted as well. Through an unfortunate selectivity in its recounting of events, the majority attempts to cloud the issue, but any careful reading of the facts demonstrates the error of that view.

"To invoke his Sixth Amendment right under *Faretta* a defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request." *Dorman v. Wainwright,* 798 F.2d 1358, 1366 (11th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987). While that may be the rule of the Eleventh Circuit, the new rule of the Fourth appears to be to the contrary. Absent a Zen-like persistence in uttering a single man-

tra, or the ability to spout crisp legalese with full citation to binding authority, a defendant's desire to represent himself will not be respected. The right to represent oneself before a jury of one's peers is the bedrock of the Sixth Amendment, for "the right to defend is personal." *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540–41. The trial court's aversion to Fields conducting cross-examination prevented it from giving Fields' self-representation claim sufficient consideration. I am afraid that in trying to protect these children, a majority of this court also closed its eyes to Fields' invocation of his right to represent himself. The fact that this court does not like the consequences flowing from an application of a defendant's Sixth Amendment rights does not justify its taking a defendant's request to represent himself any less seriously.

### III.

I am most disturbed by the court's decision to use this case as the vehicle by which it could reconsider the scope of the Sixth Amendment's right to self-representation. Holdings in the alternative are suspect, because they enable the court to address controversies not necessary for the proper resolution of the case, and thus fly in the face of judicial restraint. That the court should write constitutional law in the alternative is particularly troubling in light of the fact that we generally avoid reaching constitutional questions whenever possible. Having concluded that Fields did not invoke his self-representation right, there was no reason for the court also to determine the extent to which the right to self-representation can be limited in the same manner that Confrontation Clause rights are limited under *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The majority could have affirmed the district court's denial of this habeas petition without analyzing the case under *Craig.* Although styled as an alternative holding, Part III of the majority opinion—and the constitutional question with which it wrestles—is the raison d'etre of this en banc consideration of the case.

The constitutional discussion undoubtedly comes as a complete surprise to the parties in this case. The issue was not raised in the original briefs and, although we asked for

supplemental briefing, the court did not ask the parties to include a discussion of the constitutional question. As a result, the parties' briefs focus on the questions originally debated, i.e., whether Fields invoked his *Faretta* right and what standard of review should be employed in answering that question. Furthermore, the extent to which Confrontation Clause analysis should be applied to the self representation setting was dealt with only briefly at oral argument. Nevertheless, with no briefing and virtually no oral argument on this point, the court has taken upon itself to raise and answer a constitutional question not necessarily implicated by the facts of this case.

Because the parties never presented this appeal as one of constitutional moment, I am reluctant to address the Confrontation Clause issue. Unlike the majority, however, which makes binding circuit law through the use of an alternative holding that borders on *dicta*, I recognize that what follows holds no precedential value. Nonetheless, because I believe the majority's view of this constitutional matter is completely in error, I feel compelled to respond.

In one sweeping sentence, the majority collapses the distinction between rights under the Confrontation Clause and the right to self-representation. Nowhere in its discussion of the Confrontation Clause does the majority acknowledge the most glaring difference between *Maryland v. Craig* and *Fields v. Murray*—that only one of these defendants wished to proceed with the benefit of counsel. Craig was never in jeopardy of losing his right to cross-examine witnesses. His attorneys were present to conduct such an examination on his behalf. As a result, his rights under the Confrontation Clause could never be completely eviscerated. The worst-case scenario for Craig was not being allowed to *face* his accusers personally. Denying Fields the right to proceed *pro se,* however, not only meant that his right to represent himself would not be respected, but also meant that he would not be permitted to conduct cross-examination in the way he saw fit. The trial court's repudiation of Fields' Sixth Amendment right to self-representation had a domino effect unparalleled in the *Craig* setting. The stark differences between *Craig* and this case make it difficult for me to understand how the majority can assert so boldly that "[i]f a defendant's Confrontation Clause right can be limited in the manner provided in *Craig,* we have little doubt that a defendant's self-representation right can be similarly limited." *Majority Opinion,* at 1035. The most troubling aspect of this assertion is that it appears to be based on little more than the fact that *Faretta* did not garner the vote of more than six justices and that self-representation rights are not explicitly provided for by the Sixth Amendment, as are Confrontation Clause rights. *Id.*

As an initial matter, the majority gives insufficient respect to the self-representation right, ignoring the historical underpinnings of the right as discussed in *Faretta.* See 422 U.S. at 821–32, 95 S.Ct. at 2534–40. The *Faretta* Court clearly stated that the right of self-representation is the foundation upon which the rights explicitly guaranteed by the Sixth Amendment rest. A defendant's right to assistance of counsel exists primarily to ensure that a defense can be conducted in the most effective manner possible:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; *it grants to the accused personally the right to make his defense. . . .* Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. *The right to defend is given directly to the accused,* for it is he who suffers the consequences if the defense fails.

*Id.* at 819–20, 95 S.Ct. at 2533 (footnote omitted) (emphasis added). The Court then elaborated upon the danger of forcing an attorney upon the unwilling defendant:

> To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. . . . Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Id.* at 820–21, 95 S.Ct. at 2533–34 (footnote omitted). *Faretta* thus focuses on the personal nature of the right to represent oneself and on the defendant's right to formulate and execute his own defense. While the Constitution guarantees the defendant the right to the assistance of counsel in the formulation and execution of his defense, the defense must, in the end, remain the defendant's own. That is the very essence of the right involved, and it must be honored as part of " 'that respect for the individual which is the lifeblood of the law.' " *Id.* at 834, 95 S.Ct. at 2541 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)).

The majority's holding that a defendant's *Faretta* right can be limited when child witnesses take the stand is inconsistent with express Supreme Court precedent. In *McKaskle v. Wiggins,* 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122 (1984), the Court defined the right to proceed *pro se,* in part, by the defendant's opportunity to question witnesses:

> A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire,* to question witnesses, and to address the court and the jury at appropriate points in the trial.

These "specific rights to make his voice heard ... form the core of a defendant's right of self-representation." *Id.* at 177, 104 S.Ct. at 950. The *Faretta* right is eroded where "the jury's perception that the defendant is representing himself" is destroyed. *Id.* at 178, 104 S.Ct. at 951. This is so because

> [f]rom the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

*Id.* at 179, 104 S.Ct. at 951.

The majority's most significant mistake is assuming that the self-representation right

described in *Faretta* and *Wiggins* and the Confrontation Clause right analyzed in *Craig* are based on similar concerns. In the *Faretta* context, it is critical that the defense remain under the control of the accused and that the jury perceive the defendant as being in control. Rather than focusing on the defendant's right to direct his defense, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig,* 497 U.S. at 845, 110 S.Ct. at 3163. So long as this reliability is ensured, the defendant's right to confront his accusers can be curtailed in order to satisfy important public policy concerns.

In *Craig,* the Supreme Court addressed the constitutionality of a set of Maryland trial procedures that allowed victims of child abuse to testify in the abuse prosecution proceedings by means of closed circuit television if "[t]he judge determines that the testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate." *Id.* at 841 n. 1, 110 S.Ct. at 3161 n. 1. Craig argued that the statute violated his rights under the Confrontation Clause. In upholding the statute, the Court found that, although the physical presence component of the confrontation right is a core value, it is "not the *sine qua non* of the confrontation right." *Id.* at 847, 110 S.Ct. at 3164. Thus, when necessary to further an important public policy and when the reliability of the testimony is otherwise assured, the face-to-face component of the Confrontation Clause right can be denied. The Court found this result to be permissible only because the other components of the right, namely oath, cross-examination, and observation of demeanor by the trier of fact, preserve the underlying purpose of the Confrontation Clause itself—the reliability of testimony. *See id.* at 851–52, 110 S.Ct. at 3166–67 (concluding that Maryland procedure did not "impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause").

The majority's determination that *Craig* essentially dictates the result in this case

ignores the fact that the right to proceed *pro se* encompasses more than the "accuracy" and "reliability" concerns that form the core of Confrontation Clause analysis. "The right to proceed *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *Wiggins,* 465 U.S. at 178, 104 S.Ct. at 951. While the reliability of children's testimony in the *Craig* setting can be assured even without a defendant's face-to-face confrontation with the witnesses, the autonomy and dignity concerns that are an integral component of the self-representation right cannot be safeguarded unless the defendant is permitted to conduct his defense personally. Fields was not given this opportunity.

Because the right to confront one's accusers and the right to self-representation are of differing natures, I do not think that the Supreme Court's decision in *Craig* can be seen as casting much light on the questions raised in this case.[3] The Supreme Court's opinion in *Craig* modifies the confrontation right while assuring that the underlying purpose is preserved. In this instance, preserving the underlying purpose of the self-representation right can be effectuated by modifying the procedures involved in cross-examination,[4] but not by eliminating the right altogether. While the Court in *Craig* was careful to ensure that the reliability concerns which the Confrontation Clause aims to satisfy would not be significantly compromised by the removal of the witnesses from the same room as the defendant, I simply do not believe that we can force an attorney on to a defendant, as the majority does, and say that the self-representation right's underlying concern with defendant autonomy can be preserved.

In sum, I disagree with the majority's application of *Craig* to the self-representation scenario. Confrontation Clause rights and the right to proceed *pro se* are significantly different, and, although easy analogy may make sense on the surface, the underlying distinctions dictate a different result. There is no doubt that concern for children can, and should, force accommodations of some constitutional rights; but the right with which we deal here is particularly important, not only to the defendant who is denied his right to defend himself personally against the charges brought against him, but also to our system of justice as a whole, which is made less fair by telling some defendants that they may not serve as their own defense. The rule of law is a law of rules, and the emotional response of the majority in this case will ripple far into the future, as constitutional rights, which are constitutional in nature precisely because they ought not be subject to the whim of the majority on any given day, are governed by the countervailing pressures of outside concerns.

I therefore dissent.

**3.** The Maryland legislature, in developing a series of trial court procedures that could be used to limit a defendant's ability to confront his victims face-to-face, implicitly recognized the distinction between Confrontation Clause rights and the right to represent oneself. *See Maryland v. Craig,* 497 U.S. 836, 840 n. 1, 110 S.Ct. 3157, 3161 n. 1, 111 L.Ed.2d 666 (1990) (citing Maryland Cts. & Jud. Proc.Code Ann. § 9–102(c) (1989) (noting that "[t]he provisions of this section do not apply if the defendant is an attorney pro se.")).

**4.** The trial court properly could employ special procedures that preserve the core right of the defendant to conduct his own defense while adequately protecting the welfare of the child witnesses. Among the procedures from which the trial court could choose, assuming that they are permitted under local law, would be: installing a screen or other barrier between the defendant and the witnesses; conducting closed sessions out of the courtroom; placing the defendant and the witnesses in separate rooms; requiring the defendant to submit his questions to the judge who, after scanning them, would read them aloud to the witnesses; and requiring the defendant to remain seated at counsel table while questioning the witnesses. So long as the jury is given a proper jury instruction in order to caution against the danger of prejudice, the trial judge is in the best position to determine which of these procedures would work best in the particular situation. Furthermore, should any of these measures be unavailing in restraining a defendant's obstreperous behavior, it remains true that a "potentially unruly defendant may and should be clearly forewarned that deliberate ... obstructive behavior may constitute waiver of his pro se rights." *United States v. Dougherty,* 473 F.2d 1113, 1125 (D.C.Cir.1972).