**[J-44-2019] [OAJC: Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 57 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court at No. 266 MDA 2017 dated |
| | : | April 12, 2018 Vacating the Judgment |
| v. | : | of Sentence dated January 13, 2016 |
| | : | of the Lackawanna County Court of |
| | : | Common Pleas, Criminal Division, at |
| PATRICK TIGHE, | : | No. CP-35-CR-0001297-2012 and |
| | : | Remanding for resentencing. |
| Appellant | : | |
| | : | ARGUED: May 14, 2019 |

**CONCURRING AND DISSENTING OPINION**

JUSTICE WECHT                                             DECIDED: February 19, 2020

I agree with the Plurality's judgment, as reflected in the Opinion Announcing the Judgment of the Court ("OAJC"), that the issues as to which we granted review—which concern the tension between protecting a criminal defendant's right to represent himself and avoiding where possible the imposition of excessive trauma upon a child witness—should not be resolved here. But for much the same reason, I disagree with the Plurality's suggestion that we should decide this case by adopting *sua sponte* a novel principle of law that the parties did not pursue and the lower courts did not address.

As the learned Plurality relates, these issues hinge upon the Supreme Court's decision in *Maryland v. Craig*, 497 U.S. 836 (1990), and the Court of Appeals' decision in *Fields v. Murray*, 49 F.3d 1024 (4th Cir. 1995). *Craig* held that the state may limit a defendant's Confrontation Clause right by arranging for a child victim witness to give

testimony remotely, rather than in court in the presence of the defendant, but only upon a case-specific determination that in-court testimony will cause trauma to the witness that exceeds the ordinary emotional difficulty of facing one's assailant. *See Craig*, 497 U.S. at 857. In *Fields*, the Court of Appeals extended this limiting principle from the context of the Confrontation Clause to the right to self-representation, reasoning generally that, because each was rooted in the Sixth Amendment, they could be subject to similar limitations. *See Fields*, 49 F.3d at 1035.[1]

As set forth above, these holdings hinged upon a case-specific examination of the traumatic effect upon the witness of being confronted or examined by the defendant. In this case, we cannot answer these questions because, not only does the record lack any fact-finding on this particular point,[2] but the Commonwealth expressly waived the opportunity the trial court afforded it to produce evidence relevant to that inquiry.[3]

Rather than stop there, however, the Plurality instead relies upon the right-for-any-reason doctrine to hold that Patrick Tighe forfeited his right to represent himself when he

---

[1]     In *Fields*, the analogy it drew between the permissibility of limiting the right of confrontation and limiting the right of self-representation comprised an alternative basis for decision. Separately and dispositively, it affirmed the lower court's determination that the defendant had failed successfully to invoke his right to self-representation in the first instance. *Fields*, 49 F.3d at 1034.

[2]     *See* OAJC at 19 ("If there is a parallel between limitations of the confrontation and self-representation rights guaranteed by the Sixth Amendment and Article I, Section 9 of the Pennsylvania Constitution, relevant evidence would presumably be required to justify those limitations . . . . Accordingly, this case is a poor vehicle to decide the matter, as there simply was no evidentiary showing with respect to [victim's] emotional response to direct questioning by appellant.").

[3]     *See* OAJC at 6.

contacted the victim months before trial and implored her not to pursue his prosecution.[4]

Notably, the parties expressly have eschewed forfeiture as a basis for decision. Two of the three questions upon which we granted review expressly frame the issue as *excluding* waiver or forfeiture, and the third issue implicates the emotional trauma test that the Plurality correctly determines we should not address on the present record. *See Commonwealth v. Tighe*, 195 A.3d 850 (Pa. 2018) (*per curiam*) (respectively qualifying the first and second questions "for reasons other than waiver or forfeiture of [the right to self-representation]," and "absent waiver or forfeiture of the accused's right to self-representation").[5] Accordingly, throughout their briefing here, as in the Superior Court, the parties do not address the subject of forfeiture by conduct of the right to self-representation.[6]

---

[4]      *See* OAJC at 19-22.

[5]      The Plurality reproduces the questions in full. *See* OAJC at 11-12.

[6]      The Plurality's assertion that Tighe himself dedicates three pages of his brief to forfeiture clearly mischaracterizes the collective thrust of that passage. *See* OAJC at 12 n.15 (citing Brief for Tighe at 12-14) ("[A]ppellant's brief devotes several pages to this precise issue [*i.e.*, forfeiture]."). In point of fact, Tighe mentions forfeiture only in reciting the broad principles and limitations governing self-representation generally, and concludes the very passage in question:

> There is no suggestion that [Tighe] waived or forfeited his right to self-representation after it was granted. The court did not find [Tighe] disrespectful or disruptive, nor was it implied or indicated in the record. The record shows [that Tighe] exercised proper decorum in questioning witnesses and in addressing the court.

Brief for Tighe at 14 (footnote omitted). Thus, Tighe did not invite this Court's *sua sponte* treatment of forfeiture in resolving his appeal. Moreover, the Commonwealth only refers to forfeiture once, in a footnote distancing itself from that principle. *See* Brief for the Commonwealth at 15 n.2 ("Appellant's and Amicus'[s] suggestions that the Commonwealth is claiming that Appellant 'forfeited' his right to represent himself is

The right-for-any-reason doctrine may be applied only under limited circumstances. We have explained:

> Where a court makes a correct ruling, order, decision, judgment or decree, but assigns an erroneous reason for its action, an appellate court will affirm the action of the court below and assign the proper reason therefore. This approach however is only appropriate where the correct basis for the ruling, order, decision, judgment or decree is clear upon the record. . . . Where disputed facts must be resolved appellate courts should refrain from assuming the role of a fact-finder in an attempt to sustain the action of the court below.

*Bearoff v. Bearoff Bros., Inc.*, 327 A.2d 72, 76 (Pa. 1974) (cleaned up).

The legal basis of the Plurality's "any reason" is not found in Pennsylvania law. Instead, the Plurality relies upon the California Supreme Court's decision in *People v. Carson*, 104 P.3d 837 (Cal. 2005), which it cites for the proposition that acts other than in-court disruptions may warrant forfeiture of the right to counsel, a principle that this Court has not previously endorsed. *See* OAJC at 20. However, in relying upon *Carson* for the mere proposition that conduct warranting forfeiture of the right to counsel need not happen during trial or inside the courtroom, which may well be sound, the OAJC entirely disregards the numerous caveats the *Carson* court identified as relevant to a forfeiture inquiry.

The *Carson* court explained that "[t]ermination of the right of self-representation is a severe sanction and must not be imposed lightly. Nonetheless, . . . trial courts should be given sufficient discretion when confronted with behavior—whether occurring in court or out of court—that threatens to compromise the court's ability to conduct a fair trial." *Carson*, 104 P.3d at 839. But the court cautioned that "[n]ot every obstructive act will be

___

incorrect. Rather, the Commonwealth's position is that the right can be 'narrowly limited' as the Superior Court concluded.").

so flagrant and inconsistent with the integrity and fairness of the trial that immediate termination is appropriate." *Id.* at 841-42.

Accordingly, the California court emphasized, before finding forfeiture of the right to self-representation, the trial court must specifically examine whether the defendant's conduct has given the court good cause to believe that the defendant will disrupt the proceedings or compromise the integrity of the trial itself:

> It is incumbent on the trial court to document its decision to terminate self-representation with some evidence reasonably supporting a finding that the defendant's obstructive [out-of-court] behavior seriously threatens the core integrity of the trial. . . .  To this end, the court may need to hold a hearing or may want to solicit the parties' respective arguments with written points and authorities and any evidentiary support on which they may seek to rely. . . .
>
> Such a record should answer several important questions.  Most critically, a reviewing court will need to know the precise misconduct on which the trial court based the decision to terminate.  The court should also explain how the misconduct threatened to impair the core integrity of the trial.  Did the court also rely on antecedent misconduct and, if so, what and why?  Did any of the misconduct occur while the defendant was represented by counsel?  If so, what is the relation to the defendant's self-representation?  Additionally, was the defendant warned such misconduct might forfeit his *Faretta* rights?[7]  Were other sanctions available?  If so, why were they inadequate?  In most cases, no one consideration will be dispositive; rather, the totality of the circumstances should inform the court's exercise of its discretion.

*Id.* at 842-43 (cleaned up).  The record before us informs these questions only glancingly, if at all, and only to the extent we choose to make our own factual determinations where the trial court did not.  In fact, the trial court's findings of fact are no more responsive to

---

[7]   *See Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant has a constitutional right to represent himself when he voluntarily chooses to do so, and that a state may not force a lawyer upon him).

*Carson*'s numerous concerns than they are to the questions as to which we granted review.[8]

In *Carson*, the defendant received evidence from an investigator to which he was not entitled, including, *inter alia*, contact information for the prosecution's witnesses. *Id.* at 843. This breach was especially troubling because the defendant had a history of multiple attempts to suborn perjury, fabricate an alibi, and intimidate a prosecution witness. *Id.* The trial court held a hearing, reviewed the investigative materials upon their retrieval from the defendant's cell, and made certain findings of fact. But the trial court had made no express assessment relative to the numerous factors that the California Supreme Court deemed critical in determining whether to impose the "severe" sanction of forfeiture. Rather than summarily denying the defendant's right to self-representation based upon its own interpretation of the record, the California Supreme Court remanded the case for further fact-finding on these questions. *Id.* at 844.

---

[8] The California Supreme Court in *Carson* recommended a totality-of-the-circumstances analysis involving eight discrete factual considerations. While the Plurality faults me for observing that the record is not responsive to these factors, in purporting to follow the *Carson* approach, the Plurality identifies only "the precise misconduct on which the trial court based the decision to terminate" self-representation—Tighe's violation of the no-contact order. From that undisputed misconduct the Plurality infers that the trial court necessarily deemed Tighe's right to cross-examine the victim forfeit based upon the fact that the Commonwealth suggested forfeiture as grounds for precluding Tighe's cross-examination and the trial court granted the Commonwealth's requested relief. *See* OAJC at 22-23 n.23. This inference is unwarranted given that the Commonwealth ventured several independent bases for such a result, including theories not rooted in forfeiture, and that the trial court *never* expressly embraced forfeiture as its guiding theory, a problem I discuss at length below. More importantly, though, the Plurality omits even to mention let alone consider seven of *Carson*'s eight defining factual and prudential considerations—among them "how the misconduct threatened to impair the core integrity of the trial," "was the defendant warned such misconduct might forfeit his" right to self-representation, "[w]ere other sanctions available," and, if so, "why were they inadequate." *Id.*

Carson had an indisputably lengthier history of misconduct implicating the integrity of trial than Tighe's behavior in this case. Unlike Carson's, Tighe's misconduct was isolated to a single incident. Carson repeatedly had attempted to influence others to compromise the truth-determining process. I do not intend to minimize the impropriety of Tighe's violation of the no-contact order, nor am I naïve about his intention to discourage the victim from moving forward with this prosecution. However, even taking the victim's own testimony at face value, I cannot agree with the Plurality's characterization of Tighe's communication with the victim as sufficient without more to justify infringing his constitutional right to self-representation when the trial court itself declined to do so.

Even assuming that any degree of witness intimidation in advance of trial may furnish a sufficient basis for forfeiture of the right to self-representation, here the trial court did not clearly find that this was the effect of Tighe's contacts with his alleged victim, nor did the court even suggest that it anticipated disruptive trial behavior or other in-court conduct likely to compromise the integrity of the trial, *Carson*'s overriding concern. Tighe was not warned that his behavior could result in forfeiture of his right to represent himself. Upon learning of the violation, even though Tighe had already confirmed his desire to proceed *pro se*, the trial court elected to impose an alternative sanction upon Tighe in revoking his bail, returning him to jail, and resetting bail at $750,000, a sanction designed to ameliorate the victim's stated fear for her personal safety prompted by the call.[9] After

_____

[9]   Because the Plurality necessarily predicates its entire forfeiture analysis on the victim's comments at this proceeding, it is worth noting that she related only her contemporaneous response to the call, spoke only in the past tense, and she was neither asked nor commented upon how that call might bear upon her testimony at trial. *See* Notes of Testimony, 6/4/2013, at 47 ("I was scared. I was shocked. I didn't know what to think because I wasn't notified that [Tighe] was out [on bail]. I felt like I was scared he

Tighe's isolated, albeit serious violation of the no-contact order and the trial court's decision to sanction him by revoking his bond, Tighe made no further effort to contact the victim, impede her testimony, or otherwise interfere with the proceedings. To the contrary, no one claims that Tighe ever again behaved in any way inconsistent with due decorum or the rules of court or in a manner that otherwise threatened to compromise the integrity of the truth-determining process. Thus, even under the *Carson* approach, the record lacks a sufficient basis to support forfeiture, and, at a minimum, the trial court should have the opportunity to conduct fact-finding tailored to that specific inquiry in the first instance.

The California rule does not strike me as unsound, applied with the care for the important constitutional right that the *Carson* court's circumspection embodied. Other courts also have embraced a similarly cautious approach to the forfeiture by conduct of a defendant's right to represent himself, holding that there must be some nexus between the disruptive conduct and the likelihood of disrupting the trial proceedings. *See Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."); *United States v. Smith*, 830 F.3d 803, 810 (8th Cir. 2016) (quoting *United States v. Flewitt*, 874 F.2d 669, 674 (9th Cir. 1989)) ("A defendant granted *pro se* status may . . . be required to comply with pretrial orders, but pretrial activity is relevant to continued *pro se* status *only if it affords a strong indication that the defendant will disrupt the proceedings in the courtroom*." (cleaned up; emphasis added)). In *Smith*, the Court

---

would find me. I didn't know if he was already trying to find me. . . . I felt like I was in danger.").

of Appeals expressed the view that, even faced with a disruptive defendant, the best judicial response is to impose "lesser sanctions" than forfeiture. *Id.*[10]

This Court, too, has suggested that a defendant who behaves disruptively should receive a warning that he risks forfeiting his right to represent himself and should be granted a subsequent opportunity to behave appropriately:

> All defendants, even those who may display the potential to be disruptive, have the right to self-representation. In such instances, however, it is advisable that stand-by counsel be appointed. . . . [I]n such circumstances . . . [t]he court should explain to the defendant the standards of conduct he will be expected to observe. If the defendant misbehaves, he should be warned that he will be removed from the court, his right to represent himself will be considered waived, and the trial will continue in his absence with standby counsel conducting the defense. *If the defendant again misbehaves, these measures should be taken.*

*Commonwealth v. Abu-Jamal*, 720 A.2d 79, 109 (Pa. 1998) (cleaned up; emphasis added). But no such opportunity was granted Tighe, and such restraint is nowhere to be found in the Plurality's expansive application of the *Carson* rubric.

Even where a rule of *settled* Pennsylvania law furnishes a right-for-any-reason ground for disposition, this Court should be cautious in applying it, especially when doing so in the context of discretionary review diverts us from the questions we intended to review. We should be more reluctant still to do so when the legal principle relied upon has not yet been endorsed in the relevant form by this Court, the parties offer no advocacy

---

[10] In *Faretta*, the Supreme Court incorporated by reference its decision in *Illinois v. Allen*, 397 U.S. 337 (1970), which concerned not the right to self-representation, but rather a defendant's Sixth Amendment right to be present during his trial. In *Allen*, noting that "courts must indulge every reasonable presumption against the loss of constitutional rights," the Court held that a defendant can forfeit his right to be present if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343.

concerning that principle, the record reveals limited and contested factual support for its application, and the trial court's fact-finding is devoid of factual predicates critical to the novel principle's application. *See In re A.J.R.-H.*, 188 A.3d at 1176 ("[The right-for-any-reason doctrine] may not be used to affirm a decision when the appellate court must weigh evidence and engage in fact finding or make credibility determinations to reach a legal conclusion."); *cf. Mitchell v. Wisconsin*, ___ U.S. ___, 139 S. Ct. 2525, 2551 (2019) (Gorsuch, J., dissenting) ("While I do not doubt that the Court may affirm for any reason supported by the record, the application of the exigent circumstances doctrine in this area poses complex and difficult questions that neither the parties nor the courts below discussed.").

The Plurality's *sua sponte* adoption of a foreign jurisdiction's reasoning in a case that involved facts and circumstances far more pertinent to the risk of disruptive conduct than those presented in this case—and yet still declined to find forfeiture absent fact-finding directly addressing the risk of disruptive behavior or a compromised proceeding presented by the defendant's self-representation—reflects an extraordinary and imprudent employment of the right-for-any-reason doctrine. In merely precluding Tighe from cross-examining one witness, the trial court signaled that its specific concern was not disruption or other conduct imperiling the integrity of the proceedings, but rather the risk of trauma to the witness. *See* Tr. Ct. Op. at 28-30.[11]

---

[11]     In this regard, the trial court cited Tighe's violation of the no-contact order, victim's testimony that his phone call "scared" and "shocked" her because she had not been aware of Tighe's release on bail, her contemporaneous fear that she was in danger, and Tighe's "position of trust as a friend of the family." Tr. Ct. Op. at 29-30. None of these findings suggest that the trial court considered whether they indicated a likelihood that Tighe's cross-examination of the victim would disrupt the trial proceedings months later, or that the trial court even viewed the record through that lens.

The distinction between approaching the question as one involving threats to the integrity of the trial and concerns for the infliction of extraordinary trauma on the victim is not trivial, it is defining. In this regard, the remedies applied in each case reveal the distinction: In none of the forfeiture authorities cited by the Plurality, nor in any I have consulted, did the court order a forfeiture remedy limited to a particular witness. Rather, where a defendant comports himself (in or out of court) in a fashion that raises questions about his ability to adhere to courtroom rules and play his part in an orderly proceeding, the remedy is either exclusion or the categorical denial of the right to self-representation in favor of the retention or appointment of counsel to carry on the defendant's defense. Conversely, witness-specific limitations appear to have arisen only in cases like *Craig* and *Fields*, where the issue revolves around how sharing a courtroom with the defendant or enduring the defendant's cross-examination will affect a witness. Thus, that the trial court repeatedly alluded to its obligation to balance Tighe's right to self-representation with countervailing concerns for the traumatic effect of Tighe's personal cross-examination on the victim makes abundantly clear that the court framed the issue as a *Craig/Fields* question, not one implicating forfeiture.

To demonstrate otherwise, the Plurality relies heavily on the Commonwealth's characterizations of its objections rather than the trial court's own contemporaneous and *post hoc* explanations of its reasoning. This undermines the Plurality's effort to find anything in the trial court's own commentary and stated reasoning that supports the findings of fact necessary to find forfeiture. *Compare* OAJC at 3 (quoting Notes of Testimony ("N.T."), 6/4/2013, at 37-38) (Commonwealth: "[W]hen we talk about self-representation, the question of forfeiture always arises.") *with* N.T., 6/4/2013, at 39 (The

court: "I find that in denying your right to cross-examine the complaining witnesses [for purposes of the bail revocation hearing] it is important to this [c]ourt that I balance the competing interest[s] here[:] your right to self-representation and the right of the state to protect the complaining witness from emotional harm.").

In the most vivid example of this approach, the Plurality avers:

> As the record plainly shows, the trial court prohibited [Tighe] from personally cross-examining the victim at trial in response to the Commonwealth's motion alleging appellant had forfeited the right to do so by his own pre-trial behavior. . . . [T]he court **twice** determined that issue in favor of the Commonwealth—on June 4, 2013, the court granted the Commonwealth's forfeiture motion for purposes of the bail revocation hearing, and on July 3, 2013, the trial court granted the Commonwealth's forfeiture motion for purposes of trial based upon the same pre-trial behavior.

OAJC at 6 n.8 (emphasis in original). But that the trial court twice granted the Commonwealth's motion does not mean it did so for any one among several reasons ventured by the Commonwealth in advocating for the ruling.

To the contrary, in support of its June 4, 2013 decision to bar cross-examination of the victim in the bail revocation proceeding, the trial court cited concerns for witness trauma. *See* N.T., 6/4/2013, at 39 ("I find that in denying your right to cross-examine the complaining witness here today there is no prejudice to you because of the nature of the proceedings, the nature of the alleged violation, and it is important to this [c]ourt that I balance the competing interest[s] here[:] your right to self-representation and the right of the state to protect the complaining witness from emotional harm."). And in ruling upon the cross-examination issue for purposes of trial a month later, the trial court once again cited concerns for trauma, not disruption or the integrity of the proceedings:

> [F]or a number of reasons, I'm going to deny your request, sir, that you be allowed to cross examine [the victim]. And in particular, the court is concerned because there was a violation of the bail condition of no contact. That is something that does concern me, number one. Number two, the

age of the victim. And number three, it is alleged by the Commonwealth that because you were a friend of her parents, you stood in a position of trust with the minor child. So for those reasons, sir, in balancing your right to represent yourself pursuant to the Sixth Amendment of the constitution and also balancing the rights of the victim in this Case to not be subject to emotional harm or trauma during the proceedings, I'm going to deny your request that you cross[-]examine [the victim] . . . .

N.T., 7/3/2013, at 9-10. The trial court again reduced its reasoning to concerns for witness trauma in its Pa.R.A.P. 1925(a) opinion, a context allowing for more careful reflection and articulation than extemporaneous commentary in open court, which serves as the trial court's final word on the matter. *See* Tr. Ct. Op. at 30 ("In conclusion, this [c]ourt finds that denying [Tighe] the right to personally cross-examine [the victim] was necessary to protect her from additional and unnecessary 'emotional trauma.'").

Similarly unavailing is the Plurality's reliance upon the Commonwealth's Memorandum of Law on the subject, filed the day before the July 3, 2013 hearing, to establish that the court accepted forfeiture as a basis for restricting Tighe from cross-examining the witness at trial. The Plurality posits that, "[i]mplicit in the court's statement [on July 8, 2013, which alluded to the no-contact violation, the victim's age, and Tighe's "position of trust" relative to the victim,] is that its ruling decided the Commonwealth's forfeiture motion alleging appellant had forfeited his right to cross-examine the victim at trial by his willful pre-trial misconduct." *See* OAJC at 7 n.9 (citing Commonwealth's Memorandum of Law, 7/2/2013, at 13-14). However, the Plurality overlooks that forfeiture, as such, was the third of three bases upon which the Commonwealth sought to preclude Tighe's cross-examination; the first two depended upon the victim-trauma approach derived from *Craig* and *Fields*. Thus, even to call the Commonwealth's motion a "forfeiture motion" is question-begging. And the inference that the trial court relied upon

this third theory rather than the *Craig*/*Fields* victim-trauma approach is serially belied by the trial court's own accounts of its reasoning for granting the Commonwealth's motion.

Notably, the Plurality eschews the very same caution that underlies its decision not to analyze the questions as to which we granted review. In that connection, the Plurality specifically observes that "this case is a poor vehicle to decide the [questions presented], as there simply was no evidentiary showing with respect to [victim's] emotional response to direct questioning by appellant." *Id.* at 19. But if the record does not suffice to sustain that determination, despite the trial court's frequent invocation of that concern, then certainly it does not speak specifically to the risk that Tighe would disrupt or otherwise threaten the integrity of the trial by cross-examining the victim, which the trial court never addressed in those terms. If anything, the victim's testimony that she felt threatened by Tighe's imprecations better supports the prospect of excess trauma than it does the concern that Tighe would not conduct himself appropriately at trial.

The liberties the Plurality takes in this case illustrate why the right-for-any-reason doctrine has far more utility in resolving a direct appeal as of right than it does in an appeal by allowance. Where a court cannot decline entirely to decide a given appeal, and it perceives a clear legal basis for upholding the lower court's judgment based upon undisputed findings of record, it is better to affirm on that basis than to protract the matter by reversing and remanding for the trial court to apply the correct analysis to reach the same result.

As a Court of last resort, however, our review typically is discretionary, and we may decline to review a case entirely, or dismiss a case as improvidently granted, if we determine that the questions we granted allowance of appeal to resolve are moot or

otherwise not well-suited to facilitate our principal function of advancing the law. Indeed, the Court's decision not to review the issues as to which we granted review in this case embodies this principle, and amounts to such a dismissal. When we dismiss a case as improvidently granted, we leave the lower court's ruling undisturbed without any endorsement of that court's reasoning, an outcome much the same for practical purposes as affirming on an alternative basis.[12] In this way, we can defer deciding an issue prematurely, rather than resolving the case on an analytic basis as to which the lower courts, the parties, and other interested individuals or entities have had no notice or opportunity to advocate. The concern for judicial efficiency that animates the right-for-any-reason doctrine is of limited relevance to a court of last resort exercising discretionary jurisdiction; nothing is more efficient, nor more judicious, than dismissing an appeal as improvidently granted when it becomes clear that it would be imprudent to decide it on the record and advocacy presented.

---

[12] Respectfully, the Plurality's suggestion that its statement of disapproval in a footnoted *dictum* will be treated by the lower courts as precedential, or even persuasive, is neither required as a matter of law nor assured in practice. *See* OAJC at 23 n.23 ("O]ur decision does not have the same practical effect as would a dismissal of the appeal as improvidently granted , , , ,"); *see also id.* at 19 n.19 (noting disapproval of Superior Court's reasoning). Neither this Court nor the lower courts are bound by our commentary when it is "not crucial to our determination." *In re L.J.*, 79 A.3d 1073, 1081 (Pa. 2013); *Maloney v. Valley Med. Facilities*, 984 A.2d 478, 490 (Pa. 2009) (quoting *N'Western Nat'l Ins. Co. v. Maggio*, 876 F.2d 320, 323 (7th Cir. 1992)) ("No court . . . is obliged to treat a dictum of another court . . . as binding precedent."). The Plurality's conclusory footnote clearly comprises *dicta* because it pertains to a legal question that has no ultimate bearing upon its analysis. *Cf. Commonwealth v. Romero*, 183 A.3d 364, 400 n.18 (Pa. 2018) (plurality) ("Of course, *dicta* often present risks of unforeseen complications and unintended consequences, which is why reliance upon them to resolve those same complications can be difficult to justify, if not ill-advised.").

That we specify the questions as to which we grant review is not a mere courtesy. It ensures transparency, informing the parties and the greater legal community of what this Court intends to decide, granting all interested citizens—and especially the parties— the opportunity to proceed in full awareness of what is at stake, which is nothing less than the advancement of Pennsylvania law.[13] The Plurality's employment of the right-for-any-reason doctrine disserves these goals by introducing a new common-law rule to Pennsylvania, derived from a reading of non-binding foreign case law more expansive than the issuing court, itself, suggested, despite the parties' disclamation of any interest in litigating for or against that rule of law, and without trial court fact-finding made with an eye toward that rule's factual predicates.[14]

I agree with the Plurality that the record betrays an important void relative to the questions we set out to answer. But precisely for that reason, I would dismiss this case as improvidently granted. Accordingly, I respectfully disagree with the Plurality's election to affirm the lower court's decision on an alternative basis.

---

[13] For this reason, the Plurality's casual dismissal of the terms employed by Tighe in seeking this Court's review, which this Court adopted rather than reworded, is troubling. *See* OAJC at 23 n.23 ("Although we accepted the questions as phrased by appellant— which included his self-serving representations that he neither waived nor forfeited his right—we are not obligated to accept those representations as true. . . ."). It is well within this Court's discretion to reword questions when necessary to cleanse them of misleading or tendentious assertions. Moreover, for all the foregoing reasons, the representations that the Plurality suggests are not true in fact accurately describes the proceedings below.

[14] By declining to incorporate limiting principles like those that carefully circumscribed the *Carson* court's ruling, the Plurality opens the door to courts in future cases deeming defendants' important right to self-representation forfeit for individual out-of-court incidents that do not necessarily satisfy the limiting factors enumerated in *Carson* or comport with the caution we applied in the related Confrontation Clause context in *Abu-Jamal*, *supra*. The potential for unintended consequences is precisely why we hesitate to declare new rules without the benefit of focused advocacy highlighting the benefits and risks of a given rule.